UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Hotel 57 L.L.C. and 1260 BB Property, LLC

　　　　　　Plaintiffs,

　　　-against-

FSR International Hotels Inc. and Four Seasons
Hotels Limited,

　　　　　　Defendants.

Case No. _____

# MEMORANDUM OF LAW IN SUPPORT OF
# PETITION FOR APPOINTMENT OF ARBITRATORS

PRYOR CASHMAN LLP
7 Times Square, 40th Floor
New York, NY 10036
Phone: (212) 421-4100
Fax: (212) 326-0806

SCANDAGLIA RYAN LLP
55 E. Monroe Street, Suite 3440
Chicago, IL 60603
Phone: (312) 580-2020
Fax: (312) 782-3806

*Counsel for Petitioners Hotel 57 L.L.C. and 1260 BB
Property, LLC*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND ......................................................................................................3

   A.  The Parties' Commercial Relationship and the HMA .....................................................3

   B.  Four Seasons' Mismanagement and Termination Underlying the Arbitration......................4

   C.  The Parties' Arbitration Agreement.............................................................................4

   D.  The Arbitrator Selection Process ...............................................................................5

   E.  The Breakdown of the Selection Process......................................................................6

ARGUMENT ..........................................................................................................................9

   A.  The FAA and the New York Convention Empower the Court
       to Make the Appointment Because the Parties Are at an Impasse .......................................9

   B.  The Court Should Enter an Order Remedying the Parties' Impasse ...................................12

       1.  The Court Should Order the Appointment of Arbitrators
          in Accordance with the Selection Process under the HMAs ..........................................12

       2.  In the Alternative, the Court Should Directly
          Appoint an Appropriate Panel of Three Arbitrators .....................................................14

CONCLUSION.....................................................................................................................14

## TABLE OF AUTHORITIES

**CASES**                                                                                              **PAGE(S)**

*Baylor Health Care Sys. v. Beech St. Corp.*,
   Misc. No. 3:13-MC-054(SAF), 2013 WL 2095777 (N.D. Tex. May 15, 2013) ...................11

*Certain Underwriters at Lloyd's, London v. Vintage Grand Condo. Ass'n, Inc.*,
   18-Civ-10382(CM), 2019 WL 760802 (S.D.N.Y. Feb. 6, 2019) .............................................9

*Creative Tile Mktg., Inc. v. SICIS Int'l, S.r.L.*,
   922 F. Supp. 1534 (S.D. Fla. 1996) ......................................................................................13

*Evangelical Lutheran Good Samaritan Soc'y v. Moreno by Hatton*,
   No. Civ 16-1355(JB\KS), 2019 WL 999736 (D.N.M. Feb. 28, 2019) ...................................11

*GAR Energy & Assocs., Inc. v. Ivanhoe Energy Inc.*,
   No. 1:11-CV-00907 AWI JLT, 2011 WL 6780927 (E.D. Cal. Dec. 27, 2011)......................13

*Jain v. De Mere*,
   51 F.3d 686 (7th Cir. 1995) ...................................................................................................9

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Source One Staffing LLC*,
   16 -CV-6461(JMF), 2016 WL 5940920 (S.D.N.Y. Oct. 13, 2016)........................................11

*Odyssey Reinsurance Co. v. Certain Underwriters at Lloyd's London Syndicate 53*,
   615 F. App'x 22 (2d Cir. 2015) ............................................................................................10

*Odyssey Reinsurance Co. v. Certain Underwriters at Lloyd's London Syndicate 53*,
   No. 13 CV 9014(PAC), 2013 WL 6902689 (S.D.N.Y.)........................................................10

*Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*,
   814 F.2d 1324 (9th Cir. 1987) ..............................................................................................10

*In re Salomon Inc. S'holders' Derivative Litig.*,
   68 F.3d 554 (2d Cir.1995).....................................................................................................10

*Sprint Commc'ns Co., L.P. v. Albany Cnty., New York*,
   1:17-cv-0121(BKS\CFH), 2018 WL 2390121 (N.D.N.Y. May 25, 2018)......................10, 11

*Stop & Shop Supermarket Co. LLC v. United Food & Com. Workers Union Loc. 342, AFL-CIO, CLC*,
   246 F. App'x 7 (2d Cir. 2007) ............................................................................................9, 10

**STATUTES**

9 U.S.C. § 5...................................................................................................................1, 2, 9, 10

9 U.S.C. § 206..............................................................................................................1, 2, 9, 13

**RULES**

AAA Commercial Arbitration Rule 12.........................................................................................8

AAA Commercial Arbitration Rule 13......................................................................................13

AAA Commercial Arbitration Rule 14...................................................................................5, 13

AAA Commercial Arbitration Rule 18......................................................................................13

AAA Commercial Arbitration Rule L-1(b) ...............................................................................13

Petitioners Hotel 57 L.L.C. and 1260 BB Property, LLC (collectively, "Owner") respectfully submit this memorandum of law along with the Declaration of Gregory J. Scandaglia ("Scandaglia Decl.") and its annexed exhibits[1] in support of their petition pursuant to 9 U.S.C. §§ 5 & 206.

## PRELIMINARY STATEMENT

This action seeks to resolve the complete breakdown of the arbitrator selection process in a proceeding before the American Arbitration Association ("AAA") between Owner and Respondents FSR International Hotels Inc. and Four Seasons Hotels Limited (collectively, "Four Seasons") that arises out of Four Seasons' contractual and fiduciary breaches in its management of two storied hotel properties owned by Owner in New York City (Four Seasons Hotel New York) and Santa Barbara, California (Four Seasons Resort The Biltmore Santa Barbara).

The arbitration agreement between Owner and Four Seasons provides that their dispute shall be resolved by a panel of three arbitrators.  For more than five months, the parties have attempted to constitute the panel.  During that time, they have collectively exchanged eight lists of potential arbitrators and considered sixty-five different candidates.  But the parties have not reached agreement on even one arbitrator – let alone the three necessary to form the panel – and there is no prospect that they will reach agreement in the future as the parties have fundamentally different perspectives on the appropriate composition of the panel.  Because neither the selection protocol nor the applicable arbitration rules provide any mechanism for appointing an arbitrator absent mutual consent, the parties are stuck at an impasse that will indefinitely delay the arbitration proceedings absent court intervention.

---

[1] Exhibits to the Scandaglia Decl. are cited herein as "Ex. __."

The Federal Arbitration Act (the "FAA") and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") anticipate that such deadlocks in arbitrator selection will occur.  In such circumstances, both the FAA and the New York Convention empower a court to break the impasse.  9 U.S.C. §§ 5, 206.  That is what the Court should do here.

To resolve the existing deadlock, the Court should order that arbitrators be appointed in accordance with the selection process set forth in the two hotel management agreements (the "HMAs") that govern the parties' relationship.  Under that process, Owner and Four Seasons are to each select one party-appointed arbitrator and the third is to be chosen either by the two party-appointed arbitrators or, failing that, the AAA.  This is a common and standard selection process that is called for in the AAA's Commercial Arbitration Rules and in countless arbitration agreements governing complex commercial disputes.  And it is one the parties expressly agreed to and have operated under for decades.  Because this well-established process does not require mutual consent for the appointment of any arbitrator, it will provide a fair and efficient method of promptly resolving the current impasse and constituting a full panel of three arbitrators.

Should the Court be disinclined to revert to the process under the HMAs, it still should exercise its authority to directly appoint all three arbitrators.  In that event, Owner respectfully submits that the Court should consider candidates proposed by the parties and constitute a panel from among those options.  In doing so, the Court should select at least one arbitrator with experience in the hospitality industry, which will provide the panel with appropriate balance and experience to assess and resolve the parties' claims and defenses.

The parties are trapped in a selection process that has proven fundamentally unworkable and lacks any mechanism for breaking the existing deadlock.  Without a panel in place, the parties

cannot proceed with their arbitration and Owner cannot have its claims against Four Seasons heard and resolved on the merits.  That is an untenable situation.  The Court can and should resolve the impasse by exercising its statutory authority under the FAA and the New York Convention.

## FACTUAL BACKGROUND

### A.  The Parties' Commercial Relationship and the HMA.

More than two decades ago, Owner acquired Four Seasons Hotel New York ("FSNY") and Four Seasons Resort The Biltmore Santa Barbara ("FSSB").  (Scandaglia Decl. ¶ 2.)  Since then, Owner has invested hundreds of millions of dollars in the hotels to fund extensive renovations, to perform ongoing maintenance, and to support day-to-day operations.  (*Id*.)  Owner's return on that investment ultimately depends on the management and performance of the properties, and any losses generated by unprofitable operations are born solely by Owner.  (*Id.*)

To manage each hotel, Owner turned to Four Seasons.  (*Id.* ¶ 3.)  The parties entered into two separate HMAs, one governing the management of FSNY – the Second Amended and Restated Hotel Management Agreement, dated as of August 1, 1996 (as amended, the "FSNY HMA," Ex. 1) – and the other governing the management of FSSB – the Hotel Management Agreement, dated as of November 8, 1995 (as amended, the "FSSB HMA," Ex. 2) (collectively, the FSNY HMA and the FSSB HMA may be referred to as the "HMAs").  The HMAs govern the management of the hotels and set forth obligations that Four Seasons owed to Owner, including duties to maximize profits and minimize costs while operating the properties consistent with the standard of world class luxury hotels.  (Scandaglia Decl. ¶ 4.)  The structure created by the HMAs ultimately rested on the agency relationship that it expressly created, which made Four Seasons the fiduciary of Owner and required Four Seasons to manage the hotels consistent with duties of care and loyalty for the ultimate benefit of Owner.  (*Id.*)

**B.**   **Four Seasons' Mismanagement and Termination Underlying the Arbitration.**

The dispute underlying this action relates to Four Seasons' extensive mismanagement of FSNY and FSSB, in violation of its contractual and fiduciary duties, to the direct and substantial financial detriment of Owner.  (*Id.* ¶ 5.)  As a result of Four Seasons' breaches, Owner served detailed default notices on Four Seasons in February 2021 (*id.*) and then, after Four Seasons failed to cure those defaults, served notices in March 2021 terminating Four Seasons' management of both hotels under the HMAs (*id.,* ¶ 6).  However, Four Seasons refused to vacate the properties and contested Owner's termination of the HMAs, and an arbitration before the AAA was initiated on March 29, 2022.  (*Id.*)

**C.**   **The Parties' Arbitration Agreement.**

Each HMA contains an arbitration provision.  (Ex. 1, FSNY HMA, § 20.03; Ex. 2, FSSB HMA, § 19.03.)   After the parties' dispute regarding Four Seasons' mismanagement and termination arose, the parties recognized that, in the absence of any modification, the HMAs would require the parties to conduct two separate arbitrations before separate panels to resolve their disputes at each property.  (Scandaglia Decl. ¶ 7.)  To avoid multiple proceedings, the parties entered into a July 28, 2021 letter agreement (the "Letter Agreement"), to provide for a "single, consolidated arbitration . . . in New York, New York before a panel of three neutral, impartial and independent arbitrators."  (*Id.*)  Together, the HMAs and the Letter Agreement provide that the arbitration is to be conducted under the auspices of the AAA and governed by the AAA's Commercial Arbitration Rules.  (*Id.* ¶ 8.)  The Letter Agreement expressly states that the arbitration provisions of the HMAs remain in full force and effect except to the extent modified therein.  (*Id.*)

**D.    The Arbitrator Selection Process.**

The HMAs provide that arbitrable disputes among the parties shall be resolved by a panel of three arbitrators.  (Ex. 1, FSNY HMA, § 20.03(a); Ex. 2, FSSBY HMA, § 19.03(a).)  Each HMA incorporates a well-established and common selection process for complex commercial disputes.  (Scandaglia Decl. ¶ 9.)  Each party is to appoint one arbitrator.  (Ex. 1, FSNY HMA, § 20.03(a); Ex. 2, FSSB HMA, § 19.03(a).)  Then, within ten days of their appointment, the two party-appointed arbitrators are to nominate a third independent arbitrator (who, in certain types of disputes, must have at least ten years of experience in the luxury hotel business).  (Ex. 1, FSNY HMA, § 20.03(a); Ex. 2, FSSB HMA § 19.03(a).)  In the event the party-appointed arbitrators are unable to agree upon the third panel member, then the AAA is to complete the panel by making the final appointment.  (Ex. 1, FSNY HMA, § 20.03(a); Ex. 2, FSSB HMA, § 19.03(a).)  This is the same arbitrator selection procedure called for under Rules R-13 and R-14 of the AAA's Commercial Arbitration Rules.  (Scandaglia Decl. ¶ 9.)

After arbitration was initiated before the AAA, Owner and Four Seasons entered into a Stipulated Arbitration Protocol dated May 17, 2022 (the "Protocol").  (Ex. 3.)  In addition to addressing the scope of discovery in the arbitration (*id.* ¶¶ 3-8), the Protocol established a new, consensus-based process for selecting arbitrators that the parties expected would result in the prompt constitution of a complete panel.  (*Id.* ¶ 10.)

The process under the Protocol was as follows.  Each party would simultaneously submit the names of eight potential arbitrators (or "candidates") to the AAA.  (Ex. 3)  In the event that a candidate appeared on both lists (a "joint candidate"), the AAA would obtain certain disclosures from the candidate.  (*Id.*)  The AAA then was to provide those disclosures to the parties along with the names of all other candidates identified on the lists (*i.e.*, those who were identified by only one

party as potential arbitrators (an "unmatched candidate")).  (*Id.*)  After that, each party had an opportunity to identify any unmatched candidate from the other's list that it found acceptable (a "matched candidate").  (*Id.*)  The parties then would jointly telephonically contact the joint candidates and the matched candidates.  (*Id.*)  If one of those candidates confirmed their availability and willingness to serve, then that candidate became a member of the panel (subject to the subsequent use of preemptory strikes by either party).  (*Id.* ¶¶ 10-11.)  This process was to be repeated every seven business days until a panel was formed.  (*Id.* ¶ 10.)

   As the description above establishes, the Protocol allowed for an arbitrator to be seated <u>only with the express agreement of both parties</u>, either because each party independently included the same individual on its list or because a party agreed to the appointment of an individual submitted by the other party.  The Protocol did not provide any mechanism for empaneling an arbitrator in the absence of mutual agreement.

   **E.     The Breakdown of the Selection Process.**

   Each party submitted its first list of eight candidates on June 7, 2022.  (Exs. 4, 5.)  As with every subsequent exchange completed by the parties, no candidate appeared on both lists.  (Scandaglia Decl. ¶¶ 13-23.)  Under the Protocol, at that point the only remaining options available to each party were to identify an unmatched candidate that it found acceptable or to proceed with the exchange of a new list in seven days.  (Ex. 3 ¶ 10.)  But the parties did not do that.  (Scandaglia Decl. ¶ 13.)

   Understanding that the process under the Protocol could quickly devolve into an endless exchange of dueling candidate lists, the parties agreed to defer the exchange of additional lists and to convene joint interviews of two candidates – one identified by each party – to assess their suitability as arbitrators.  (*Id.*)  The first was the Honorable Kathleen Roberts, who had been

nominated by Four Seasons and was interviewed on June 20, 2022, and the second was the
Honorable Eileen Brewer, who had been nominated by Owner and was interviewed on June 21,
2022. (*Id.*) Both interviews (as with all subsequent ones) were extended and substantive, taking
roughly an hour or more and addressing matters such as the arbitrator's personal and professional
background, legal, industry and other experience, and perspective on arbitration proceedings. (*Id.*
¶ 14) Following the interviews, though, the parties did not agree to the appointment of either Judge
Roberts or Judge Brewer. (*Id.*)

The parties exchanged a second set of candidate lists on June 28, 2022. (Exs. 6, 7.) Again,
no name appeared on both lists and the parties agreed to delay the next set of lists while they
interviewed potential arbitrators. (Scandaglia Decl. ¶ 16.) The parties ultimately interviewed one
candidate from Owner's list, the Honorable Ariel Belen, on July 14, 2022. (*Id.* ¶ 17.) But they
did not reach agreement on Judge Belen's appointment to the panel. (*Id.*)

The parties exchanged a third set of lists on July 20, 2022. (Exs. 8, 9.) As before, no name
appeared on both lists, and the parties agreed to delay the next set of lists while they interviewed
potential arbitrators. (Scandaglia Decl. ¶ 19.) The parties sought to interview the Honorable
Barbara Jones (who had been identified on Four Seasons' prior June 7th list) but she was unable
to serve as an arbitrator due to other commitments. (*Id.*) On August 24, 2022 and September 14,
2022 respectively, the parties interviewed Honorable Richard Holwell (from Four Seasons' June
7th list) and Mr. Daniel Larkin (who Owner proposed as an arbitrator outside of the parties' list
exchange process). (*Id.* ¶ 20.) Yet again, the parties could not agree on the appointment of either
to the arbitral panel. (*Id.*)

In light of the parties' inability to agree on even one arbitrator out of 49 candidates, on
October 6, 2022, Owner sent Four Seasons a letter regarding the arbitrator selection process. (*Id*

¶ 21.)  In the letter, Owner chronicled the parties' unsuccessful efforts to date and acknowledged that the parties had reached an impasse.  (*Id.*)  Owner expressed its willingness, at Four Seasons' request, to exchange one more round of lists, but cautioned that the impasse was prejudicing Owner and could not be allowed to persist indefinitely.  (*Id.*)

The parties exchanged a fourth set of lists on October 11, 2022.  (Exs. 10, 11.)  For the fourth time, no name appeared on both lists.  (Scandaglia Decl. ¶ 23.)  The parties contacted the Hon. Ruben Castillo (from Owner's list) for a potential interview, but he responded that he had a disqualifying conflict.  (*Id.*)  No further interviews were conducted and the parties did not agree on the appointment of any candidate.  (*Id.*)

During the list-and-interview process, Owner's focus remained on promptly and fairly constituting a panel.  (*Id.* ¶ 25.)  To that end, Owner expressed a willingness to consider alternative selection procedures.  (*Id.*)  For instance, Owner proposed using a rank-and-strike method, which is common in complex commercial disputes and is a selection method under the AAA's Commercial Arbitration Rules.  (*Id.* ¶ 26; *see* AAA Rule R-12.)  Owner also proposed reverting to the party arbitrator-based selection process under the HMAs.  (Scandaglia Decl. ¶ 27.)  While, at one point, Four Seasons' counsel promised to create a written rank-and-strike protocol for consideration, none was ever provided and Four Seasons never agreed to pursue any alternative method – either those proposed by Owner or otherwise – that could have broken the parties' deadlock.  (*Id.* ¶ 26)

The parties' impasse is in part inherent to the structure of the Protocol – which requires mutual consent for the appointment of all candidates – but is also partly philosophical.  (*Id.* ¶ 24.)  Throughout the arbitrator selection process, Owner has expressed its belief that at least one panel member should be an individual possessing experience in the hospitality industry.  (*Id*.)  But Four

Seasons has rejected every industry candidate proposed by Owner, has not proposed a single industry candidate of its own, and has stated that it does not believe a viable industry candidate can be selected.  (*Id.*)

In light of the disagreement between parties and the structure of the Protocol selection process, it is inevitable that the parties' impasse will persist indefinitely.  More than five months have elapsed since the parties entered into the Protocol.  During that period, they collectively have proposed and considered <u>sixty-five</u> candidates.  Yet the parties have not agreed on <u>even one</u> of the three arbitrators necessary to form a panel.  There is no mechanism to resolve this impasse under the Protocol.  Court intervention thus is necessary to break the deadlock.

## <u>ARGUMENT</u>

### A.    The FAA and the New York Convention Empower the Court <u>to Make the Appointment Because the Parties Are at an Impasse.</u>

Both the FAA and the New York Convention authorize a court to appoint arbitrators.  *Jain v. De Mere,* 51 F.3d 686, 692 (7th Cir. 1995) (noting that the New York Convention and FAA each empowers the appointment of arbitrators by courts).  Section 5 of the FAA states that "if for any . . . reason" there is "a lapse in the naming of an arbitrator or arbitrators," then "upon the application of either party to the controversy, the court shall designate and appoint an arbitrator or arbitrators."  9 U.S.C. § 5.  Likewise, Section 6 of the New York Convention provides that a "court may also appoint arbitrators in accordance with the provisions of the agreement."  9 U.S.C. § 206.

Because the FAA and the Convention have overlapping coverage, judicial appointment of an arbitrator frequently is evaluated under the "lapse" standard set forth in Section 5.  *Certain Underwriters at Lloyd's, London v. Vintage Grand Condo. Ass'n, Inc.*, 18-Civ-10382(CM), 2019 WL 760802, at *2 n.1 (S.D.N.Y. Feb. 6, 2019).  The purpose of Section 5 is to "grant[] parties access to a neutral forum, the courts, to correct failures" in the arbitrator selection process.  *Stop*

& Shop Supermarket Co. LLC v. United Food & Com. Workers Union Loc. 342, AFL-CIO, CLC, . 246 F. App'x 7, 11 (2d Cir. 2007) (noting "Congress anticipated that breakdowns in the arbitrator selection process might indefinitely delay arbitration proceedings"); *see also Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 814 F.2d 1324, 1329 (9th Cir. 1987) (noting Section 5 was enacted to avoid "endless bickering over the selection process").  Section 5's lapse standard requires nothing more than "<u>a lapse in time</u> in the naming of the arbitrator . . . or <u>some other mechanical breakdown</u> in the arbitrator selection process." *Odyssey Reinsurance Co. v. Certain Underwriters at Lloyd's London Syndicate 53*, 615 F. App'x 22, 22-23 (2d Cir. 2015)  (quoting *In re Salomon Inc. S'holders' Derivative Litig.,* 68 F.3d 554, 560 (2d Cir.1995)) (emphasis added).

    *Odyssey Reinsurance* provides a clear example of the federal courts' role in resolving impasses when selecting arbitrators.  615 F. App'x 22 (2d Cir. 2015).  In the context of a reinsurance dispute which was to be arbitrated before a panel of three arbitrators, *see* Petition for Order Appointing Arbitration Umpire, *Odyssey Reinsurance Co. v. Certain Underwriters at Lloyd's London Syndicate 53*, No. 13 CV 9014(PAC), 2013 WL 6902689, at *12 (S.D.N.Y.), the Second Circuit overturned a district court refusal to appoint the third and final arbitrator to the panel.  *Odyssey*, 615 F. App'x at 23.  In doing so the Second Circuit rejected the trial court's determination that there had not been an impasse, and held that the parties' inability to agree on a chairperson constituted a deadlock, which was the "precise situation Section 5 was designed to address."  *Id.* (internal citation omitted)*; see also Stop & Shop*,  246 F. App'x at 11 (noting that courts are not only authorized but "obligat[ed]" to resolve impasses in arbitral panel formation).

    Moreover, Section 5 applies irrespective of the particular cause of the breakdown.  9 U.S.C. § 5 ("for any other reason"); *Pac. Reinsurance Mgmt. Corp.*, 814 F.2d at 1329 ("Further, Congress intended the judge's appointment powers to be exercised notwithstanding the fault of parties in

availing themselves of the agreed selection process."); *see also Sprint Commc'ns Co., L.P. v. Albany Cnty., New York*, 1:17-cv-0121(BKS\CFH), 2018 WL 2390121, at *3 (N.D.N.Y. May 25, 2018) (holding Section 5 applied where the parties' selection process had dragged on for months and they disagreed about the cause of the delay); *Evangelical Lutheran Good Samaritan Soc'y v. Moreno by Hatton*, No. Civ 16-1355(JB\KS), 2019 WL 999736, at *8 (D.N.M. Feb. 28, 2019) (holding Section 5 applied where the parties did not agree on an arbitrator after six months); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Source One Staffing LLC*, 16 -CV-6461(JMF), 2016 WL 5940920, at *1 (S.D.N.Y. Oct. 13, 2016) (appointing arbitrator and noting that resolving panel-selection deadlock "gives effect to the parties' agreement to arbitrate"); *Baylor Health Care Sys. v. Beech St. Corp.*, Misc. No. 3:13-MC-054(SAF), 2013 WL 2095777, at *2 (N.D. Tex. May 15, 2013) (holding Section 5 applied where two party-appointed arbitrators failed to agree on a third after five months and fourteen candidates).

The parties here are inarguably at an impasse.  Owner and Four Seasons have spent more than five months attempting to empanel three arbitrators.  (Scandaglia Decl. ¶¶ 12-23.)  They have exchanged eight lists of arbitrators and proposed and considered sixty-five candidates.  (*Id.*)  That process has involved extensive due diligence and interviews as well as discussions between counsel regarding each party's views.  (*Id.* ¶ 14.)  Yet the parties have not agreed to the appointment of a single arbitrator.  (*Id.* ¶ 24, 28.)

There is no prospect that the parties will resolve the present impasse.  The Protocol requires unanimity in selecting arbitrators, and the parties have a fundamental disagreement on the appropriate composition of the panel.  Owner has consistently maintained that – given the complex, fact-intensive, and industry-specific nature of the parties' dispute – an appropriate panel should have at least one arbitrator with direct experience in the hospitality industry.  Industry candidates

11

are routinely appointed in complex commercial arbitrations, and the HMAs recognize that industry arbitrators play a unique role, requiring that, for certain types of disputes, the third arbitrator have at least ten years of experience in the hotel business.  (Ex. 1, FSNY HMA §20.03(a); Ex. 2, FSSB HMA § 19.03(a).)  But Four Seasons has rejected each industry candidate proposed by Owner, refused to propose any of its own industry candidates, and maintained that it does not believe a viable industry candidate can be selected.  (Scandaglia Decl. ¶ 24.)  The Protocol provides no mechanism for resolving this disagreement to allow for the constitution of a panel.

In light of the parties' failure to agree on any arbitrator for five months and their fundamental disagreement about the composition of an appropriate panel, it is clear that the parties cannot and will not resolve the deadlock in which they are now trapped absent court intervention.

### B.   The Court Should Enter an Order Remedying the Parties' Impasse.

Because the FAA and the New York Convention provide for resolution of the parties' impasse by court intervention, the only question is how best to achieve that resolution.

### 1.   The Court Should Order the Appointment of Arbitrators in Accordance with the Selection Process under the HMAs.

The HMAs themselves provide a practical and appropriate selection method to resolve the parties' impasse.  Each of the HMAs provides, in relevant part, that in the event of an arbitration, each party shall appoint one arbitrator and the third shall be chosen by agreement of the two-party appointees or, failing that, the AAA.  (Ex 1, § 20.03(a); Ex. 2, § 19.03(a).)  The Court can and should order that the appointments be made in that manner.

The process established in the HMAs is the most appropriate method for resolving the present deadlock because it is in accord with the parties' expectations.  The HMAs provide this method of arbitration selection for all disputes between the parties, and the parties have been bound by that process for decades.  Now that the parties' alternative approach under the Protocol has

proven unworkable, their express written agreement in the HMAs should control.  This resolution is consistent with the fundamental principles of contract law that govern arbitration as it respects the intent and agreement of the parties.  *See* 9 U.S.C. § 206 (providing for the Court to "appoint arbitrators in accordance with the provisions of the [arbitration] agreement"); AAA Rule L-1(b) (reflecting that in large, complex commercial disputes such as the underlying arbitration, the parties may seek the appointment of arbitrators with technical and other qualifications).

Appointment in accordance with the HMA process undoubtedly will resolve the present impasse.  Each party can select a party-appointed arbitrator within a matter of days.  If those two arbitrators then are unable to reach agreement on a third arbitrator, the AAA would have the authority to select the final panel member.  No step in the selection process would be dependent on the mutual consent of the parties or otherwise subject to breakdown.  A full panel could be constituted promptly without any need for further court intervention.  For this precise reason, when confronted with similar arbitrator selection impasses, courts have directed parties to proceed by selecting party-appointed arbitrators.  *See, e.g., GAR Energy & Assocs., Inc. v. Ivanhoe Energy Inc.*, No. 1:11-CV-00907 AWI JLT, 2011 WL 6780927, at *10 (E.D. Cal. Dec. 27, 2011) (ordering the parties to select party arbitrators); *Creative Tile Mktg., Inc. v. SICIS Int'l, S.r.L.,* 922 F. Supp. 1534, 1540 (S.D. Fla. 1996) (directing parties to each choose party arbitrators who would then select an independent neutral).

Moreover, proceeding with the HMA process will not cause any undue prejudice to any party.  This method is standard in complex commercial arbitrations and is provided for under Rules R-13 and R-14 of the AAA's Commercial Arbitration Rules.  By agreeing in the HMAs to be bound by this process, each party has acknowledged it is fair and reasonable in the context of their relationship.  And the AAA's Commercial Arbitration Rules provide appropriate protections to

13

ensure any party-appointed arbitrator satisfies the AAA's standards of impartiality and independence.  (*See* AAA Rules R-13 and R-18.)

Under the present circumstances, the appropriate method to resolve the parties' intractable impasse is to revert to the fair and reasonable selection process that they have already agreed to use in the HMAs.

### 2.    In the Alternative, the Court Should Directly Appoint an Appropriate Panel of Three Arbitrators.

If the Court is disinclined to use the process agreed to by the parties in the HMAs, it alternatively should resolve the impasse by directly appointing all three arbitrators from the candidates proposed by the parties during the list-and-interview process.  Owner respectfully requests that any such panel have at least one arbitrator who has direct experience in the hospitality industry.  The underlying arbitration between the parties involves a significant and highly complex dispute related to the management of two world-class luxury hotels that implicates lengthy and complex hotel management agreements, a wide range of operations from labor and revenue management to maintenance to capital expenditures, and various industry customs, practices and standards.  An individual with hotel industry expertise would enhance a panel by assisting the arbitrators in processing, contextualizing, and understanding the industry-specific issues and evidence that will be part of the arbitration.  Therefore, any panel constituted by direct appointment of the Court should include at least one industry arbitrator.

## CONCLUSION

For the foregoing reasons, Owner respectfully requests that the Court enter an order providing for the appointment of arbitrators in the manner requested above.

Dated:  October 31, 2022
        New York, New York                   Respectfully submitted,


                                             ___*/s/ Todd E. Soloway*___
                                             Todd E. Soloway
                                             Bryan T. Mohler
                                             PRYOR CASHMAN LLP
                                             7 Times Square, 40th Floor
                                             New York, NY 10036
                                             Phone: (212) 421-4100
                                             Fax: (212) 326-0806
                                             Email: tsoloway@pryorcashman.com
                                                    bmohler@pryorcashman.com

                                             Gregory J. Scandaglia
                                             (*pro hac vice* application forthcoming)
                                             Joseph R. Swee
                                             (*pro hac vice* application forthcoming)
                                             SCANDAGLIA RYAN LLP
                                             55 E. Monroe Street, Suite 3440
                                             Chicago, IL 60603
                                             Phone: (312) 580-2020
                                             Fax: (312) 782-3806
                                             Email: gscandaglia@scandagliaryan.com
                                                    jswee@scandagliaryan.com


                                             *Counsel for Petitioners Hotel 57 L.L.C. and 1260 BB*
                                             *Property, LLC*