UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Hotel 57 L.L.C. and 1260 BB Property, LLC,

                   Petitioners,

    -against-

FSR International Hotels Inc. and Four Seasons
Hotels Limited,

                 Respondents.

Case No. 1:22-cv-09331 (LLS)

---

## DECLARATION OF ANTHONY S. FIOTTO
## IN SUPPORT OF MEMORANDUM IN OPPOSITION
## TO PETITION FOR APPOINTMENT OF ARBITRATORS

Pursuant to 28 U.S.C. § 1746, ANTHONY S. FIOTTO declares:

1. I am a partner at the law firm of Morrison & Foerster LLP, counsel of record for Respondents Four Seasons Hotels Limited ("**FSHL**") and its subsidiary, FSR International Hotels Inc. ("**FSR**") (collectively, "**Four Seasons**") in the above-captioned matter.

2. I am admitted to practice in the Courts of New York. I submit this declaration in support of Four Seasons' Memorandum of Law in Opposition to Petition for Appointment of Arbitrators (the "**Petition**" or "**Pet.**").

**Background**

3. Since 1987, FSHL has managed and operated the Four Seasons Resort The Biltmore Santa Barbara ("**FSSB**") pursuant to a Hotel Management Agreement dated as of November 8, 1995, between FSHL and 1260 BB Property, LLC ("**1260 Property**") and its predecessor (collectively, with amendments, the "**FSSB HMA**"). FSHL began managing the

1

FSSB thirteen years before Petitioners, through 1260 Property, acquired it in 2000.  Under the FSSB HMA, FSHL has the right to manage the FSSB until December 31, 2055.

4.      Since 1993, FSR has managed and operated the Four Seasons Hotel New York ("**FSNY**") pursuant to the Second Amended and Restated Hotel Management Agreement dated as of August 1, 1996, between FSR and Hotel 57 L.L.C. ("**Hotel 57**") and its predecessor (collectively, with amendments, the "**FSNY HMA**").  FSR began managing the FSNY six years before Petitioners, through Hotel 57, acquired it in 1999.  Under the FSNY HMA, FSR has the right to manage FSNY until December 31, 2073.  (The FSNY HMA and the FSSB HMA are collectively referred to as the "**HMAs**," and FSNY and FSSB are collectively referred to as the "**Hotels**.")

**The Dispute Underlying the Petition**

5.      The Petition seeks the Court's intervention in the selection of arbitrators for a dispute that Petitioners allege relates to Four Seasons' purported "mismanagement" of the Hotels "in violation of its contractual and fiduciary duties." (Pet. ¶ 16.)  Four Seasons vigorously disputes this false characterization, as it has not breached any contractual or fiduciary duties in its management of the Hotels.  In fact, throughout its time managing the Hotels, Four Seasons has worked to make them two of the most iconic properties in the world and looks forward to continuing to successfully manage the Hotels on behalf of Petitioners and per the terms of the long-standing HMAs for years to come.  For more than 60 years, Four Seasons and its affiliates have set the global standard for excellence in luxury hospitality and service.  Four Seasons has proudly managed FSNY since its opening in 1993 and FSSB since 1987 and has always fulfilled its obligations under the HMAs.

6.     Following the closure of the Hotels in early 2020 due to the COVID-19 global pandemic, Four Seasons proposed re-opening plans for each Hotel.  Warner then responded in the summer of 2020 by requiring that Four Seasons fundamentally restructure the HMAs and reduce the size and the components of the Hotels that would remain under Four Seasons' management.

7.     When Four Seasons resisted, in early 2021, Warner claimed that Four Seasons had breached the HMAs and issued Notices of Default and Termination pursuant to the HMAs (the "**Default Notices**").  These breach claims are unfounded, and Four Seasons issued Notices of Dispute (the "**Dispute Notices**") which, under the terms of the HMAs, preclude any termination of the contracts.  Warner has subsequently refused to reopen the Hotels.

8.     As Four Seasons has issued valid Dispute Notices under the HMAs, Petitioners' claims that Four Seasons has been terminated from its management role and "refused to vacate" the Hotels (Pet. ¶ 16) are false.  FSHL and FSR continue to manage and maintain the Hotels pursuant to the terms of the HMAs.  In fact, Warner has repeatedly taken the position that Four Seasons must continue to operate under the terms of the HMAs, notwithstanding his refusal to reopen the Hotels.

9.     For instance, on June 17, 2022, well after Four Seasons' purported termination, Greg Scandaglia, Warner's and Petitioners' outside counsel (and a signatory to the Petition), delivered a letter to Four Seasons' outside counsel, Paul Wagner, relating to FSSB.  In that June 17 letter, Scandaglia stated that "[u]nder the terms of [the] HMA, [FSHL] *is* the agent of 1260 BB Property, LLC" (emphasis added).  Mr. Scandaglia did not refer to FSHL as the *former* agent of 1260 BB Property, LLC.

10.     One month later, on July 25, 2022, Cathy Hwang, the Chief Financial Officer of Ty Warner Hotels and Resorts, Inc. ("**TWHR**"), sent letters on behalf of Petitioners to both FSR and

FSHL regarding the Annual Plans required by the HMAs for each Hotel, stating that the "Owner . . . has demanded on multiple occasions that Operator comply with its Annual Plan obligations for 2022."  (Ms. Hwang sent effectively identical letters to FSHL and FSR on July 25, 2022, notwithstanding the fact that Four Seasons had previously agreed with TWHR to defer submitting an Annual Plan until the Hotels were re-opened, and Four Seasons had previously submitted 2022 Annual Plans for the Hotels on June 8, 2022).  The obligations which Ms. Hwang was insisting that Four Seasons comply with arose many months *after* Warner claims that Four Seasons had been terminated from its management role at the Hotels.

**The Original Arbitration Agreements in the HMAs**

11.    Relevant sections of the HMAs are attached as **Exhibit 1** (the FSSB HMA) and **Exhibit 2** (the FSNY HMA).

12.    The HMAs contain dispute resolution clauses, including an arbitrator selection process in which each party selects an arbitrator, and those arbitrators select the third panelist (the "**Party Selection Clause**") (Ex. 1, § 19.03 FSSB HMA; Ex. 2, § 20.03 FSNY HMA).

13.    The HMAs' dispute resolution clauses do not expressly require that all three arbitrators must be neutral, impartial, or independent.  When the HMAs were executed, there was no requirement, as there was when the Existing Arbitration Agreements (as defined below) were executed, that a party selected arbitrator be neutral, impartial or independent—the AAA rules of that time did not include Rule 13(b), which provides that party-selected arbitrators "*must meet the standards of R-18 with respect to impartiality and independence* unless the parties have specifically agreed" otherwise pursuant to R-18(b) (emphasis added).  (*See infra* at ¶¶ 24 and 25.) In fact, at the time the HMAs were executed, party selected arbitrators were not subject to disqualification due to "circumstances likely to affect impartiality, including any bias or any

financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives." (*See id*.)

14.     Additionally, the HMAs' provisions on dispute resolution contain two additional sections that are relevant to the Petition even though the provisions have been superseded by the EAAs (as defined below).

15.     Section 20.03(a) of the FSNY HMA provides that "in the case of any arbitration in respect of sections 19.05 and 19.06(a), such third arbitrator shall be an independent arbitrator with at least ten years of experience in the luxury hotel business in the target market in which the Hotel competes and a partner of either Pannell Kerr Forster or one of the four largest firms of Certified Public Accountants in the United States" (the "**Industry Panelist Clause**"). (Ex. 2, §§ 19.05, 19.06(a), 20.03(a) FSNY HMA).

16.     Section 19.03(a) of the FSSB HMA contains a similar provision with respect to disputes regarding Section 18.07 of that document. (Ex. 1, §§ 18.07, 19.03(a) FSSB HMA).

17.     In other words, the only provisions of the HMAs which require an industry panelist for dispute resolution are Sections 19.05 (*i.e.*, whether the FSNY achieved a defined performance test) and Section 19.06(a) (*i.e.*, whether Four Seasons remains one of the world's leading operators and managers of a chain of luxury and five-star hotels) of the FSNY HMA, and Section 18.07 of the FSSB HMA (*i.e.*, regarding the turnover of certain books and records on termination of the FSSB HMA) (Ex. 2, §§ 19.05, 19.06(a) of FSNY HMA; Ex. 1, § 18.07 FSSB HMA).

18.     None of these HMA Sections is the basis for the purported breaches identified in the Default Notices (or in Four Seasons' subsequent Dispute Notices) that constitute the basis for the arbitration underlying the Petition.

19. The second set of relevant provisions in the HMAs are Section 20.02(b) of the FSNY HMA and Section 19.02(b) of the FSSB HMA, which provide that, in the event of a dispute, before any party may initiate arbitration, the parties must first engage in a non-binding mediation and that "each [party] shall retain an expert . . . and the experts . . . shall advise the parties of their views" (the "**Expert Mediation Clause**") (Ex. 2, § 20.02(b) FSNY HMA; Ex. 1, § 19.02(b) FSSB HMA).

**The July 2021 Agreement and the May 2022 Protocol**

20. Given the nature of the disputes set forth in the Default Notices and the Dispute Notices, the parties intentionally agreed to fundamentally alter the dispute resolution process set forth in the HMAs by entering into two new agreements, the July 2021 Agreement and the May 2022 Protocol (collectively the "**Existing Arbitration Agreements**" or "**EAAs**"). Mr. Scandaglia and I negotiated and drafted the EAAs.

21. First, in the July 2021 Agreement, attached as **Exhibit 3**, the parties delineated which disputes are to be subject to the July 2021 Agreement. That agreement encompasses only disputes identified in the Default Notices and the Dispute Notices. *Id*. at 1-2. Second, the July 2021 Agreement provided that, in lieu of the Party Selection Clause, the parties agreed to a single, consolidated arbitration in New York "before a panel of three neutral, impartial and independent arbitrators." *Id*. at 2. Third, because the disputes identified in the Default and Dispute Notices do not include disputes that would have been subject to the Industry Panelist Clause, the parties dispensed with that clause altogether. Fourth, also because the disputes do not involve matters that require particular industry knowledge, the parties replaced the Expert Mediation Clause with a clause mandating mediation before David Geronemus, a non-expert with respect to the hospitality industry. *Id*. at 2.

22.    After the parties completed a mediation with Mr. Geronemus, the parties agreed to the May 2022 Protocol, attached hereto as **Exhibit 4**, to govern the process for selecting the arbitrators in their dispute.

23.    The May 2022 Protocol confirmed the parties' rejection of the Party Selection Clause and the Industry Panelist Clause.  Section 10 of the May 2022 Protocol states, "[w]ith respect to selecting the three neutral, impartial and independent arbitrators referenced in the July [2021] Agreement, the Parties shall follow the following process."  The May 2022 Protocol provides that each party submits a list of arbitrator candidates to the AAA every seven business days until the panel is selected.  If there are matches on the parties' lists, the matches serve as arbitrators.  If there are no matches on the parties' lists, either party may agree to select a candidate on the other party's list.  If there is a match, or one party agrees to a candidate on the other party's list, "[t]he Parties' counsel . . . jointly telephonically contact each potential arbitrator."  This ensures complete neutrality, in contrast to a party-appointed arbitrator whom a party is free to unilaterally contact in advance of the appointment.

24.    The May 2022 Protocol further confirmed the requirement of a panel of neutral, impartial and independent arbitrators in another way.  In the May 2022 Protocol, the parties rejected the AAA Rules in effect at the time of the HMAs and replaced them with the AAA Rules in effect at the time of the May 2022 Protocol.  The HMAs provide that any arbitration "shall be conducted in accordance with the Commercial Arbitration Rules of the AAA *as in effect on the date hereof.*"  (Ex. 1, § 19.03(c) FSSB HMA; Ex. 2, § 20.03(c) FSNY HMA) (emphasis added).  Relevant sections of the AAA Rules in effect as of the date of the HMAs are attached as **Exhibit 5**.  Section 12 of the AAA Rules in effect at the time of the HMAs provided that "an arbitrator selected unilaterally by one party is a party appointed arbitrator and is not subject to

disqualification pursuant to Section 19." (Ex. 5, § 12). Section 19, in turn, provided that an arbitrator must "disclose to the AAA any circumstance likely to affect impartiality, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives" and may be subject to disqualification as a result. (*Id*. § 19).

25.    In the May 2022 Protocol, the parties rejected this provision, providing that the arbitration "shall be governed by . . . (c) the American Arbitration Association's (the 'AAA') Commercial Arbitration Rules, including the Procedures for Large, Complex Commercial Disputes *in effect as of the Effective Date* [of the May 2022 Protocol, or May 17, 2022]. . . , except as modified herein." (Ex. 4, ¶ 1) (emphasis added). As noted in Paragraph 13 above, Rule 13(b) of those rules provides that party-selected arbitrators "*must meet the standards of Section R-18 with respect to impartiality and independence* unless the parties have specifically agreed" otherwise pursuant to Section R-18(b) (emphasis added).

26.    The May 2022 Protocol also does not contain any variation of the Industry Panelist Clause or otherwise require an industry arbitrator on the panel. This reflects an additional acknowledgement that the disputes subject to arbitration under the July 2021 Agreement and the May 2022 Protocol do not include a dispute for which, under the original HMAs, an industry arbitrator was required. Moreover, in the event any hospitality industry knowledge was useful in the arbitration, the parties included a provision in the May 2022 Protocol that, if a party wishes to introduce expert testimony, comprehensive Expert Reports under Fed. R. Civ. P. 26(a)(2)(B) would be required, as well as expert depositions—an uncommon provision in a streamlined arbitration and further confirmation that the parties rejected any requirement (and eschewed any need) for an industry panelist. (Ex. 4, ¶ 8).

27.     The EAAs state that the arbitration is seated in Manhattan, and that New York law applies to the disputes concerning the FSNY, and California law applies to the disputes concerning the FSSB.

**The Arbitrator Selection Process**

28.     Commencing on June 7, 2022, the parties began the process of submitting lists of candidates to the AAA every seven business days, except when the parties jointly and voluntarily agreed to extend the seven-day period (which occurred on seven occasions) to conduct interviews of candidates.   These agreed-upon extensions involved accommodating the schedules of the candidates, which during the summer months proved challenging.

29.      The parties provided lists to the AAA on June 7, 2022, June 28, 2022, July 20, 2022, and October 11, 2022.

30.     In July 2022, after the parties had submitted their second list of eight candidates to the AAA, Four Seasons sought to accelerate the process and agreed to interview a specified retired judge from the Petitioners' list formerly of the New York State Supreme Court.

31.     On August 4, 2022, Four Seasons agreed to accept this judge as an arbitrator if the Petitioners were prepared to select an arbitrator from candidates Four Seasons identified on its first two lists, which were submitted on June 7 and June 28, 2022.  Four Seasons proposed that, after the two arbitrators had been picked, the parties could discuss the third in light of the credentials and background of the two empaneled arbitrators.

32.     Petitioners' counsel rejected this simple, expedited solution and added a new condition to the selection process, insisting that the parties include an industry arbitrator on the panel.  Petitioners' counsel made this demand despite the facts that (a) the EAAs do not provide for an industry panelist, (b) the parties intentionally drafted two agreements that did not

incorporate the Industry Panelist Clause, and (c) even if they had incorporated the Industry Panelist Clause in the EAAs, the clause would not, by its terms, apply to the disputes identified in the Default Notices, Dispute Notices, and in the July 2021 Agreement.

33.    While the dispute between the parties is, indeed, "significant and highly complex" as described in the Petition, the issues to be addressed are not industry-specific issues that require industry knowledge.  Rather, they are complicated legal questions relating to contractual rights, the application of legal principles, and the determination of substantial economic damages.  The arbitration will also involve evaluating the credibility of numerous witnesses.  These are precisely the matters that arbitrators who have previously served as judges have developed significant expertise in addressing.

34.    The proposed industry panelists identified on Petitioners' lists are not "neutral, impartial and independent" because industry consultants primarily consult for owners of hotels or resorts—that is, they are advocates for owners—or they are engaged in working for direct competitors of Four Seasons.  Four Seasons cannot have such a panelist, who would be privy to Four Seasons' confidential, proprietary operational information.  Both the July 2021 Agreement and the May 2022 Protocol provide for confidential proceedings (and the HMAs provide for the protection of Four Seasons' proprietary information) precisely because the hospitality industry is intensely competitive.  (Ex. 1, § 8.03 FSSB HMA; Ex. 2, § 9.03 FSNY HMA; Ex. 3, the July 2021 Agreement at 2; Ex. 4, the May 2022 Protocol at ¶ 9.)

35.    Further, given Four Seasons' prominence in the hospitality industry, it would be difficult to find an industry consultant who lacks ties, conflicts of interest, or bias (one way or the other) toward it.

36.     In fact, during the arbitrator selection process, there were two instances in which Petitioners asked Four Seasons to further investigate and consider an industry panelist from Petitioners' lists.  Petitioners' counsel claimed that these two candidates did not appear to be owner advocates.  After further investigation, it was learned that one worked for three direct competitors of Four Seasons and the other, in addition to working for competitors, had decades-long relationships with a high-level former Four Seasons executive and a long-time Four Seasons consultant.

37.     Seeking to change the selection requirements again and to subvert the parties' prior agreements, in August 2022, Petitioners' counsel began insisting that the parties revert to the selection process set forth in the rejected Party Selection Clause that was expressly superseded by the EAAs.  Petitioners' counsel also proposed that the parties use the "rank and strike method . . . under the AAA's Commercial Arbitration Rules."  Both of these proposed "alternatives" were squarely rejected when the parties drafted the EAAs.  Notably, with respect to the latter, it was clear that the parties intentionally rejected a rank-and-strike selection because the parties agreed in the May 2022 Protocol to use the AAA's Commercial Arbitration Rules, relevant sections of which are **Exhibit 6**, but omitted the rank-and-strike process provided for in those rules.  (Ex. 4, ¶¶ 1, 10).

38.     The parties submitted four sets of lists to the AAA and conducted five candidate interviews.  Additionally, the parties attempted to schedule two additional interviews with two retired federal judges.  One, who appeared on Four Seasons' list, declined due to scheduling conflicts, while the other, who appeared on the Petitioners' list, identified a potential conflict.  On October 26, Four Seasons agreed to interview the judge on Petitioners' list nonetheless and

consider waiving any conflict if an appropriate "firewall" were erected.  Petitioners' counsel refused this request.

39.    On October 30, 2022, as no extension had been agreed to for that submission cycle, Four Seasons timely submitted its list of additional candidates to the AAA, as contemplated by the May 2022 Protocol.  Petitioners did not do so and instead filed the Petition on October 31, 2022.

**Additional Relevant Materials**

40.    Attached hereto as **Exhibit 7** and **Exhibit 8** are, respectively, true and correct copies of (i) Employers Insurance Company of Wausau and Nationwide Indemnity Company's Memorandum of Law in Support of Petition to Compel Arbitration and (ii) Arrowood Indemnity Company's Memorandum of Law in Opposition to Employers Insurance Company of Wausau's Motion to Compel Arbitration.  These materials were filed by the litigants in connection with this Court's decision in *Employers Insurance Company of Wausau v. Arrowood Indemnity Company*, 2013 WL 8655140 (S.D.N.Y. Oct. 25, 2013).  (The materials were filed in the United States District Court for the Western District of Wisconsin before the case was transferred to this Court.)

I declare that the foregoing is true and correct under penalty of perjury.


Dated:  November 14, 2022                              /s/ *Anthony S. Fiotto*
        Boston, Massachusetts                          ANTHONY S. FIOTTO

**CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2022, a true and correct copy of the foregoing was electronically filed and served on all parties of record via the Court's CM/ECF system.

/s/ *Anthony S. Fiotto*
ANTHONY S. FIOTTO