# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| EMPLOYERS INSURANCE COMPANY OF WAUSAU and NATIONWIDE INDEMNITY COMPANY, | ) ) ) ) | Civil Action No. 12-cv-283 |
| Petitioners, | ) ) | |
| v. | ) ) | |
| ARROWOOD INDEMNITY COMPANY, | ) ) | |
| Respondent. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PETITION TO COMPEL ARBITRATION

The primary purpose of the Federal Arbitration Act ("FAA") is to enforce arbitration agreements according to the terms of those agreements. As such, the Petitioners seek an order compelling arbitration consistent with the terms of the contracts between Employers Insurance Company of Wausau ("Wausau") and Arrowood Indemnity Company ("Arrowood"). Those terms require the party-appointed arbitrators to work together to select the third arbitrator, the umpire of the proceeding. The majority of the contracts also provide a specific process for umpire selection that controls if the party-appointed arbitrators are unable to agree on an umpire candidate. Unfortunately, Arrowood has refused to follow the contractual umpire-selection procedure, instead asking the court to adversely appoint an umpire in contravention of the contract terms. The FAA, however, is clear: When an arbitration agreement contains a method of naming an umpire, "such method shall be followed." 9 U.S.C. § 5. The contracts

between Wausau and Arrowood contain an umpire-selection method, and the party-appointed arbitrators have not yet had an opportunity to comply with that method. Under the FAA, then, the Court should enforce the contractual terms and order the arbitration to proceed in the manner provided for by the parties' agreement.

## BACKGROUND

Arrowood and Wausau entered into a series of Excess of Loss Reinsurance Agreements for various periods between January 1, 1967, and December 31, 1971 (the "Treaties"). Each of the Treaties requires that disputes between the parties be arbitrated. More specifically, each of the Treaties requires the two party-appointed arbitrators to choose an umpire to preside over the dispute. The only difference between the Treaties is that the first treaty year, 1967, does not contain the more explicit description of the umpire selection process that is contained in the remaining Treaties.

The Treaties in effect from 1968-1971 provide for a very specific umpire selection process:

> If any dispute shall arise … such dispute, upon the written request of either party shall be submitted to three arbitrators, one to be chosen by each party, and the third by the two so chosen. … If the two arbitrators fail to agree in the selection of a third arbitrator within 30 days of their appointment, each of them shall name two, of whom the other shall decline one and the decision shall be made by drawing lots. All arbitrators shall be executive officers of insurance or reinsurance companies or Underwriters at Lloyd's, London not under the control of either party to this Agreement.

(Dkt. 22, Decl. of Dotseth Ex. 1). The Treaties in the first treaty year, 1967, also provide for the arbitrators to select the umpire without addressing the procedure if the arbitrators reach a point where they cannot agree on a selection:

2

> If any dispute shall arise … the dispute shall be referred to three arbitrators, one to be chosen by each party and the third by the two so chosen.

(Dkt. 22, Ex. 2.) Therefore, the different provisions are not fundamentally inconsistent; rather, the majority of the Treaties simply provide a more explicit description of the umpire selection process in the event the arbitrators are unable to agree.

On December 12, 2011, Arrowood demanded arbitration against Wausau under these Treaties. (Dkt. 22, Ex. 3.) On January 11, 2012, Wausau responded to Arrowood's arbitration demand. Wausau denied the allegations and appointed Paul Tuhy as its arbitrator. (Dkt. 22, Ex. 4.) Subsequently, Arrowood appointed Jonathon Rosen as its party-appointed arbitrator.

After Arrowood appointed its arbitrator, the parties undertook efforts to select an umpire to preside in the arbitration. Wausau sought an agreement that the parties would abide by the umpire selection clause which explicitly provided a method of umpire selection and which is contained in the majority of the Treaties, namely, "[i]f the two arbitrators fail to agree in the selection of a third arbitrator …, each of them shall name two, of whom the other shall decline one and the decision shall be made by drawing lots." (Dkt. 22, Ex. 1.) Arrowood, however, refused to address the contract wording, instead proposing to replace the explicitly provided umpire selection process with another, detailed umpire selection process having no connection whatsoever to the terms of the Treaties. Among other things, Arrowood insisted that: each party nominate up to eight umpire candidates; each candidate complete a questionnaire on unspecified subjects; each party retain the right to challenge the neutrality of the candidates nominated by the other;

3

and the parties agree upon a striking and selection procedure only after each has accepted the neutrality of the other's candidates. Most troubling, Arrowood insisted that the parties expressly retain the option to run to court if either challenged the neutrality of any of the other's candidates.

Because Arrowood continued to insist upon using an umpire selection process that was contrary to the terms of the Treaties, Wausau sought court intervention, filing this claim on April 20, 2012. Only after Wausau was forced to seek court assistance did Arrowood's arbitrator, Mr. Rosen, contact Wausau's arbitrator Mr. Tuhy, for the first time and after instructions from Arrowood's counsel, to attempt to select an umpire. (Declaration of Paul Tuhy, ¶ 3 (hereinafter "Tuhy Decl.").) On May 29, 2012, Mr. Rosen proposed an umpire selection process which was substantially, and in all important respects, identical to the proposal put forth by Arrowood and already rejected by Wausau. (*Id.* at ¶ 4.) Mr. Tuhy considered the proposal; however, he did not respond to Mr. Rosen. (*Id.* at ¶5.) He concluded that the process was fundamentally inconsistent with the explicit process provided by the Treaties, and therefore incompatible with the arbitrators' obligations to follow the contract terms. (*Id.*) Therefore, to date, Mr. Tuhy and Mr. Rosen have not communicated about umpire selection.

On June 26, 2012, Mr. Rosen submitted a declaration in support of Arrowood's Cross-Petition to Appoint an Umpire. (Dkt. 13.) It is notable that Mr. Rosen did not state in his declaration that the selection process had lapsed at any time, nor did he state that Mr. Tuhy told him there would be no agreement on an umpire candidate or that he would not participate with the process. Indeed, the opposite is true. Both Mr. Tuhy and

4

Mr. Rosen appear ready and willing to proceed with the selection of an umpire. There just remains a disagreement regarding whether the arbitrators are required to follow the express agreement of the parties contained in the majority of the Treaties. Once this disagreement is resolved by the Court, both arbitrators seem prepared to move forward with the selection of an umpire.

Importantly, contrary to Arrowood's repeated (and completely unsupported) assertions, Wausau never interfered with Mr. Tuhy's ability to attempt to agree on the selection of an umpire. (*See* Tuhy Decl. at ¶ 8.) Rather, Mr. Tuhy simply could not agree that the proposals by Arrowood and its arbitrator—which left complete discretion to either party to refuse to accept any nominee and then proceed to court—were fair or efficient methods for moving forward in umpire selection. Moreover, Mr. Tuhy could not agree with a process that was fundamentally inconsistent with the explicit process provided by the Treaties. (*Id.* at 5.) Therefore, it is Arrowood, and its arbitrator, that have repeatedly refused to consider and pursue the streamlined selection process agreed upon by the parties in the Treaties, and steadfastly insisted on a single method which would drag out and needlessly complicate the selection process.

## ARGUMENT

**A. The Court Should Order the Parties to Proceed with Umpire Selection in accordance with the Explicit Treaty Terms.**

It is a matter of black letter FAA law that courts must *first* order parties to comply with the terms of an arbitration agreement in the selection of an arbitrator. This process serves the primary purpose of the FAA—to require enforcement of arbitration

5

agreements "according to their terms." *See Volt Info. Sciences v. Bd. Of Trs.,* 489 U.S. 468, 479 (1989). Consistent with this scheme, the FAA expressly favors selection of arbitrators by parties rather than courts. *See* 9 U.S.C. §5; *Shell Oil Co. v. CO2 Comm. Inc.,* 589 F.3d 1105, 1109 (10th Cir. 2009).

In order to facilitate this goal, Section 4 explicitly enables a party to petition for an order compelling arbitration and "directing that such arbitration proceed in the manner provided for in [the] agreement." 9 U.S.C. § 4. Likewise, Section 5 specifies that the court's authority is constrained when the contract contains a method for naming an umpire. Specifically, Section 5 provides that where an arbitration agreement contains a method of naming an umpire "such method shall be followed." 9 U.S.C. § 5.

Consequently, before a court can intervene and appoint an arbitrator, the parties must first be ordered to follow the contractually agreed method of umpire selection. *CMH Homes v. Perez,* 340 S.W.3d 444, 449 (Tex. 2011). *See also Pacific Reinsurance Management Corp. v. Ohio Reinsurance Corp.,* 814 F.2d 1324 (9th Cir. 1987) (*Pacific Re*) (a court should only take it upon itself to appoint an umpire after the parties have tried to abide by the contract provisions and failed to make such appointment); and *ATSA of Cali., Inc. v. Continental Ins. Co.,* 702 F.2d 172, 176 (9th Cir. 1983) (vacating the district court's order and remanding with direction to allow the parties an opportunity follow the contractually agreed upon process for arbitrator appointment). Ironically, Arrowood's counsel has already recognized this, and confirmed its own understanding before this very Court. Counsel, in a filing before this Court in a different proceeding when its interests were more consistent with Wausau's here, openly acknowledged that

6

"[a] court must [] look first to the arbitration agreement and enforce the specific method by which the parties agreed to appoint an arbitrator or umpire." *See Employers Ins. Co. of Wausau v. Certain Underwriters at Lloyds of London et al.,* No. 09-CV-201, Dkt. 4 (W.D. Wis. Apr. 7, 2009) (citing *Jain v. de Mere,* 51 F.3d 686, 692 (7th Cir. 1995)).

Here, the Treaties specify a process for selecting an umpire. The majority of the Treaties require that the two party-appointed arbitrators choose an umpire to preside over the dispute and "[i]f the two arbitrators fail to agree in the selection of a third arbitrator …, each of them shall name two, of whom the other shall decline one and the decision shall be made by drawing lots." (Dkt. 22, Ex. 1.) This process is not fundamentally inconsistent with the process contained in the first Treaty year which also requires the party-appointed arbitrators to select the umpire. Rather, the later Treaties merely refined that process to provide a means to resolve an impasse that may arise in the umpire selection process.

Arrowood has refused to comply with the Treaty terms. Instead, Arrowood proposed a complicated replacement process that would inevitably delay the arbitration. Arrowood, however, cannot simply avoid the parties' explicit agreement because it (and it alone) wishes it had agreed to a different process. Rather, because the parties negotiated and agreed upon the proper method of umpire selection in the Treaties, under the FAA, the Court must order the parties to arbitrate according to the terms of the Treaties. 9 U.S.C. § 5. *See also Liberty Mutual Ins. Co. v. Nationwide Mutual Ins. Co. et al.,* No. 11-10651, Dkt. 22 (D. Mass. July 6, 2011) (Order and Transcript (attached as Declaration of Melissa M. Weldon, Exhibit 1)) (ordering parties to proceed with umpire

7

selection as contemplated by the reinsurance treaties even though only some of the treaties contained a specific umpire selection provision).

### B. There has been no "Lapse" under the FAA, so the Court Lacks Jurisdiction to Appoint an Umpire at this Early Stage.

As outlined above, when an arbitration agreement contains a provision "for a method of naming [] an umpire, such method shall be followed." 9 U.S.C. § 5. The FAA only grants the authority for a court to appoint an umpire in very limited circumstances. Indeed, when a contract provides for a specific method of umpire selection, a court only has authority to intercede in the process if there has been a lapse in the naming of an umpire or a party has failed to avail itself of the umpire selection procedure. *Id.*[1] Importantly, however, before a "lapse" will have been found to occur in the process of selecting an umpire, the Court must first allow the parties to follow the process called for by the contract. Because the parties have not followed the process set forth in the Treaties, but instead have only been unable to come to agreement on what the process requires, there has been no lapse and this Court lacks the authority to appoint an umpire at this time.

---

[1] Specifically, Section 5 provides:

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in the filling of a vacancy, then upon application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire as the case may require.

9 U.S.C. §5.

The situation here is remarkably similar to *Global Reinsurance Corporation v. Certain Underwriters of Lloyds London*, 465 F.Supp.2d 308 (S.D.N.Y. 2006) ("*Global Re*"). In *Global Re*, the reinsurance contract called for the two party-appointed arbitrators to designate an umpire. *Id*. at 309. If the two could not agree, each arbitrator was to nominate one umpire candidate and the umpire would be selected by lots between the two candidates. *Id*. The contract contained express 30-day limits on each part of the process. *Id*.

Despite the 30-day limits, a panel was still not in place more than two years after the initial arbitration demand. *Id*. at 310. Frustrated with the process, one of the parties finally insisted that they proceed with the drawing of lots. *Id*. Six days later, the party objecting to the neutrality of the proposed candidates filed a petition with the court asking for an adverse umpire appointment. *Id*.

Despite this two-year process, the court determined that there was no lapse, finding that "the umpire selection was moving forward, albeit slowly." *Id.* at 311. The court concluded that it could not make an adverse appointment under the FAA unless there was a lapse and the arbitration agreement provided no alternative method for addressing the lapse. *Id*. Because there was no lapse, and because the agreement specifically included a procedure to use absent an agreement between the arbitrators, the court indicated that it was "without authority to appoint an umpire." *Id.* The court dismissed the petition and directed the parties to proceed with the alternative process for umpire selection provided for by the contract. *Id. See also, National Cas. Co. v. American Banks Ins. Co. of Florida,* No. 05-71843, 2005 WL 2291003, at **2-3 (E.D.

9

Mich. Sept. 20, 2005) (declining to appoint an umpire because the court must first order compliance with the parties express agreement).

There plainly has been no lapse here. After the parties each identified their party-appointed arbitrators in late January 2012, Wausau and Arrowood began discussions regarding umpire selection. This issue arose in the context of discussions of consolidation. Arrowood's demand sought to arbitrate in one proceeding its claims against Wausau under all the Treaties, despite the fact that no Treaty contains a provision for the consolidation of disputes involving multiple Treaties. Wausau suggested that consolidation would be agreeable provided the parties followed the umpire selection process specified in the majority of the Treaties. Arrowood refused. Rather, it suggested a complicated process with no reference to the Treaties' provision. Because of Arrowood's continued refusal to abide by the contract terms, Wausau filed this action seeking to enforce the terms of the Treaties in April 20, 2012; mere months after the parties appointed their arbitrators in accordance with the contract terms.

Moreover, it is undisputed that the arbitrators have not yet had an opportunity to attempt to appoint an umpire as required by the Treaties. Rather, the party-appointed arbitrators only attempted to initiate discussions about an umpire candidate *after* this Petition was filed. Notably, neither party-appointed arbitrator has alleged that there has been an actual lapse in the process. Indeed, quite the contrary. Both arbitrators appear willing and eager to appoint an umpire once the method of selection is confirmed by the Court. The Treaties plainly require that the arbitrators choose the umpire, and if they cannot agree, to each "name two, of whom the other shall decline one and the decision

10

shall be made by drawing lots." Because they have not yet begun this process, there has been no "lapse" as a matter of law and this Court lacks the authority to adversely appoint an umpire.

### C. Even if the Court Concluded there was a "Lapse," the Parties Must First Proceed Under the Contract Terms.

Even if the Court were to conclude that there has been a lapse, the first order of business would be to order the parties to follow the contract terms: "A district court has the authority under § 5 to select an umpire if there is a 'lapse' in the naming of an umpire '*and* the arbitration agreement in question does not provide a mechanism for filling the void.'" *Global Re,* 465 F.Supp.2d at 311 (quoting *AIG Global Trade & Political Risk Ins. Co. v. Odyssey Am. Reinsurance Corp.,* No. 5 Civ. 9152(DC), 2006 U.S. Dist. LEXIS 73258, at *16 (S.D.N.Y. Sept. 21, 2006)) (emphasis supplied). Therefore, to the extent the Court concludes there is a lapse within the meaning of Section 5, the Treaties provide the mechanism for filling the void: each arbitrator name two, strike one, and draw lots. *See id.* In this case, there is no question that the arbitrators have yet to attempt to comply with the Treaty terms. This is required before the Court may determine there has been a lapse and appoint an umpire. However, even if the Court had a factual record before it that supported the finding of a lapse, the Court is still without authority to appoint an umpire at this time because the next step in the umpire selection process is provided for in the Treaties. *See id.*

This conclusion is fully supported by the case law. In *Pacific Re,* the Ninth Circuit explicitly recognized that the FAA required a court to *first* order the parties to

11

comply with the written agreement before intervening to appoint an umpire. 814 F.2d at 1329. Specifically, it concluded that had the district court stepped in at the beginning and appointed neutral arbitrators without providing the parties an opportunity to comply with their agreement, it would have remanded. *Id.* Other courts have reached the same conclusion—that parties must make every effort to comply with the arbitration provisions in their agreements before the court can intercede to select an umpire. *See, e.g., In re Service Corp. Int'l AL and SCI Texas Funeral Services*, 355 S.W.3d 655, 659 (Tex. 2011) (citing to *CMH Homes v. Perez*, 340 S.W.3d 444, 449 (Tex. 2011) ("Before the trial court can intervene and appoint an arbitrator, section 5 requires that parties follow the previously agreed method of arbitrator selection.")); *ATSA of Cali., Inc,* 702 F.2d at 176 ("Under 9 U.S.C. § 5, the parties' method of appointing arbitrators must be followed."); *RLI Ins. V.Kansa Reinsurance Co., Ltd.,* No. 91 Civ, 4319, 1991 WL 243425, at *4 (S.D.N.Y. Nov. 19, 1991) ("When faced with an arbitration clause, courts must attempt to implement that clause as written."). This is exactly what Wausau has asked this Court to do—order the arbitrators to comply with the umpire selection process contained in the majority (and not contradicted by the remainder) of the Treaties.

      Wausau, here, merely asks the Court do what the FAA requires and exactly what Arrowood's counsel has told this Court before was the appropriate first step: "A court must [] look first to the arbitration agreement and enforce the specific method by which the parties agreed to appoint an arbitrator or umpire." *See Employers Ins. Co. of Wausau v. Certain Underwriters at Lloyds of London et al.*, No. 09-CV-201, Dkt. 4 (W.D. Wis. Apr. 7, 2009) (citing *Jain v. de Mere*, 51 F.3d 686, 692 (7th Cir. 1995)).

12

## CONCLUSION

Under the FAA, the Court's function is to enforce the agreement of the parties. The Treaties provide a method for umpire selection that was negotiated for and agreed upon by the parties at the time of contracting. The Court therefore should order the parties to proceed with umpire selection in accordance with this method.

Dated: August 24, 2012        **LARSON • KING, LLP**

By s/Keith A. Dotseth
    Keith A. Dotseth (#210304)
    Melissa M. Weldon (#275499)
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone: (651) 312-6500
kdotseth@larsonking.com
mweldon@larsonking.com

*Attorneys for Petitioners and Cross-Respondent*

LK 1341277-v1