UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Hotel 57 L.L.C. and 1260 BB Property, LLC,

               Petitioners,

      -against-

FSR International Hotels Inc. and Four Seasons
Hotels Limited,

               Respondents.

Case No. 1:22-cv-09331 (LLS)

## RESPONDENTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR RECONSIDERATION

MORRISON & FOERSTER LLP

Anthony S. Fiotto
Nathan D. Reilly
200 Clarendon Street
Boston, MA 02116
(617) 648-4774
AFiotto@mofo.com
NReilly@mofo.com

*Counsel for Respondents*
*FSR International Hotels Inc. and*
*Four Seasons Hotels Limited*

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.    STATEMENT OF FACTS ...................................................................................... 3

    A.    Background ................................................................................................ 3

    B.    The Dispute and the HMAs ..................................................................... 4

    C.    The July 2021 Agreement and the May 2022 Protocol ......................... 6

    D.    The Arbitrator Selection Process ............................................................ 8

    E.    The Parties' Positions with Respect to the Petition ............................... 11

    F.    The Court's Order ................................................................................... 12

III.    ARGUMENT ...................................................................................................... 15

    A.    The Court Erred When it "Abandoned" the EAAs and Enforced the "Eschewed" HMAs ................................................................................ 16

    B.    The Court Erred When It Found an Impasse as a Result of Agreed-Upon Extensions of Time ........................................................................ 20

    C.    The Court Erred When It Failed to Find that Any Impasse Was Due to Petitioners' Insistence on an Industry Arbitrator ............................... 22

IV.    CONCLUSION ................................................................................................... 24

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adam Techs. Int'l S.A. de C.V. v. Sutherland Glob Servs., Inc.*,
    729 F.3d 443 (5th Cir. 2013) ................................................................. 22

*AT&T Mobility LLC. v. Concepcion*,
    563 U.S. 333 (2011)..................................................................... 14, 17

*Avis Rent A Car Sys, Inc. v. Garage Emps. Union Loc. 272*,
    791 F.2d 22 (2d Cir. 1986)...................................................................... 15

*Baylor Health Care Sys. v. Beech St. Corp.*,
    2013 WL 2095777 (N.D. Tex. May 15, 2013) .................................................. 23

*Benipal v. Herath*,
    674 N.Y.S.2d 815 (3d Dep't 1998)............................................................. 20

*BP Expl. Libya Ltd. v. ExxonMobil Libya Ltd.*,
    689 F.3d 481 (5th Cir. 2012) ..................................................... 15, 17, 18

*Certain Underwriters at Lloyd's London v. Vintage Grand Condominium
    Ass'n, Inc.*,
    2019 WL 760802 (S.D.N.Y February 6, 2019) ................................................. 22

*Corines v. Am. Physicians Ins. Tr.*,
    769 F. Supp. 2d 584 (S.D.N.Y. 2011)........................................................... 15

*Delta Air lines v. Bombardier, Inc.*,
    2021 WL 1163702 (S.D.N.Y. Mar. 25, 2021) .................................................... 20

*Evangelical Lutheran Good Samaritan Soc'y v. Moreno by Hatton*,
    2019 WL 999736 at *8 (D. N.M. Feb. 28, 2019) ............................................. 23

*Karrena USA Inc. v. Cobra Thermosolar Plants, Inc.*,
    2022 WL 1185012 (D. Nev. Apr. 20, 2022)..................................................... 21

*Karrena USA Inc. v. Cobra Thermosolar Plats, Inc.*,
    2022 WL 73518 (D. Nev. Jan. 7, 2022).......................................................... 21

*Moss v. First Premier Bank*,
    835 F.3d 260 (2d Cir. 2016)................................................................ 14, 17

*Schoolcraft v. City of New York*,
    298 F.R.D. 134 (S.D.N.Y. 2014) ................................................................. 15, 16

*Shell Oil Co. v. CO2 Comm., Inc.*,
    589 F.3d 1105 (10th Cir. 2009) ...................................................................... 18

*Stop & Shop Supermarkets Co. LLC v. United Food & Com. Workers Union*
    *Loc. 342, AFL-CIO, CLC*,
    246 F. App'x 7 (2d Cir. 2007) ................................................... 14, 17, 21, 24

*T.M. Real Estate Holding LLC v. Stop & Shop Supermarket Co. LLC*,
    2013 WL 603325 (S.D.N.Y. Feb. 14, 2013)................................. 18, 19, 20, 21

*United States v. J. Kokolakis Contracting, Inc.*,
    2007 WL 1771561 (S.D.N.Y. June 19, 2007) .............................................. 20

*Univ. Reins. Corp.* v. *Allstate Ins. Co.*,
    16 F.3d 125 (7th Cir. 1993) .......................................................................... 18

**Statutes**

Fed. Arbitration Act, 9 U.S.C. § 5 .................................................... *passim*

Fed. R. Civ. P. 26(a)(2)(B) ............................................................................ 8

Four Seasons Hotels Limited ("**FSHL**") and its affiliate, FSR International Hotels Inc. ("**FSR**" and collectively with FSHL, "**Four Seasons**"), hereby submit this Memorandum of Law in Support of their Motion for Reconsideration of the Court's Opinion and Order dated June 8, 2023 (the "**Opinion**" or "**Op**.") pursuant to Local Civil Rule 6.3 of the Local Rules of the United States District Court for the Southern District of New York and Federal Rule of Civil Procedure 59.

## I.    PRELIMINARY STATEMENT

In exercising its authority to appoint arbitrators under Section 5 of the Federal Arbitration Act (the "**FAA**"), 9 U.S.C. §5, the Court clearly erred in three fundamental ways, despite making a series of correct and factually supported findings and rulings.  The Court properly found that the parties had entered into what it correctly defined as the "Existing Arbitration Agreements," or "EAAs," in 2021 and 2022, which provided for an arbitrator selection process to appoint a panel of three arbitrators.  The Court also correctly found that, in entering into the EAAs, the parties "eschewed" the different selection process contained in arbitration agreements from decades earlier that were contained in hotel management agreements, or "HMAs."[1]  The Court also correctly ruled that, under governing Second Circuit authority, its role under Section 5 was to appoint arbitrators "in a way that [gives] effect to the parties' [arbitration] agreement."  Despite these findings and that legal ruling, the Court erred when it ruled that "it is time to abandon" the agreed-upon selection process in the EAAs and ordered the parties to apply "the [selection] procedures provided in the HMAs."

---

[1] The terms "EAAs" and "HMAs" are defined below at pages 5 and 6.  The terms as defined herein are identical to terms as used by the Court in the Opinion.

The Court also erred when it found that there had been a breakdown in the EAA arbitrator selection process such that the exercise of its Section 5 authority was even necessary. Section 5 provides that, "[i]f in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if . . . there shall be a lapse in the naming of an arbitrator or arbitrators . . ., then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators." Here, there was no lapse. The parties had proceeded *exactly* as the EAA selection process mandated. That process required the parties to exchange lists of arbitrators every seven business days; if there was a match on the lists, that candidate would become one of the panelists. If there were no matches, either party could nonetheless agree that a candidate on the other party's list would be acceptable pending a joint interview by the parties' counsel. The Court ruled that a lapse had occurred—or, in the Court's language, an "impasse" had occurred—because the process had proceeded for five months without the selection of a panel. This ruling was in error because the passage of time was due solely to agreed-upon extensions between the parties to temporarily delay exchanging lists while the parties jointly interviewed panelists (who were not matches but were potentially acceptable). Put another way, there was no breakdown in a process to which the parties had clearly consented, and the Court's ruling that Section 5 authority was triggered because there was an "impasse" due to the passage of time was an error.

Finally, even if the consented-to passage of time could be considered an "impasse" or a "lapse," the Court erred when it found that Petitioners' insistence on an "industry arbitrator" was not the cause of the lapse. The decades-old HMAs selection process required an industry arbitrator to be on the panel **only** if the dispute involved several industry-specific matters that

were clearly delineated in the HMAs.  Putting aside for the moment that the Court properly found that the parties had "eschewed" the HMAs' selection process when they entered into the EAAs, it is *undisputed* that the current arbitral dispute *does not* involve the industry-specific matters prescribed in the HMAs.  Petitioners manufactured any "impasse" by making an industry panelist a pre-condition to proceeding with the process.  While the Court correctly found that the question of "fault" is irrelevant under Section 5, the Court's erroneous finding prevented it from applying the most appropriate remedy.  Although Section 5 authorizes a court to appoint arbitrators in the event of a lapse, Section 5 begins by stating that any agreed-upon selection process "shall be followed."  In other words, had the Court correctly found that any lapse was due to the Petitioners' unjustified insistence on an industry arbitrator, it could have clarified that the EAAs did not provide for such a panelist and ordered the parties to proceed with their selection guided by that clarification.

The Court's ruling is manifestly unjust because it denies Four Seasons its contractual, arbitral remedy and forces Four Seasons to expend well over a year and millions of dollars engaged in the hollow formality of arbitrating a dispute before an improperly constituted panel that is not authorized to issue a proper award.

## II.     STATEMENT OF FACTS

### A.     <u>Background</u>

Since 1987, FSHL has managed and operated the Four Seasons Resort The Biltmore Santa Barbara (the "**FSSB**").  FSHL operates and manages the FSSB pursuant to a Hotel Management Agreement dated November 8, 1995, between FSHL and 1260 BB Property LLC ("**1260 Property**") and its predecessor (collectively, with amendments, the "**FSSB HMA**"). FSHL managed the FSSB for more than a decade before Ty Warner, through 1260 Property,

acquired it in 2000.  Under the FSSB HMA, FSHL has the right to manage the FSSB until December 31, 2055.  (Fiotto Decl. at ¶ 3 (Dkt. No. 20).)[2]

Since 1993, FSR has managed and operated the Four Seasons Hotel New York (the "**FSNY**").  FSR operates and manages the FSNY pursuant to the Second Amended and Restated Hotel Management Agreement dated August 1, 1996, between FSR and Hotel 57 L.L.C. ("**Hotel 57**") and its predecessor (collectively, with amendments, the "**FSNY HMA**").  FSR began managing the FSNY six years before Ty Warner, through Hotel 57, acquired it in 1999.  Under the FSNY HMA, FSR has the right to manage FSNY until December 31, 2073.  (The FSNY HMA and the FSSB HMA are collectively referred to as the "**HMAs**" (Fiotto Decl. at ¶ 4).)

### B.    The Dispute and the HMAs

Petitioners' Petition for Appointment of Arbitrators ("**Petition**" or "**Pet.**") sought the Court's intervention in the selection of arbitrators for a dispute related to Petitioners' issuance of Notices of Default (the "**Default Notices**") under the HMAs in which Petitioners alleged instances of mismanagement.  (Pet. ¶ 16 (Dkt. No. 1).)  In response, Four Seasons disputed Petitioners' allegations in Notices of Dispute (the "**Dispute Notices**"), which, under the terms of the HMAs, triggered the arbitration provisions of the HMAs.  (Fiotto Decl. at ¶ 7.)

The HMAs contain dispute resolution clauses that include an arbitrator selection process in which each party selects an arbitrator, and those two arbitrators then select the third panelist (the "**Party Selection Clause**").  (Fiotto Decl. at ¶ 12, Ex. 2, FSNY HMA,

---

[2] "Fiotto Decl." refers to the Declaration of Anthony S. Fiotto submitted with the Memorandum of Law in Opposition to the Petition for the Appointment of Arbitrators (the "**FS Mem.**").  References to the Court's Docket are provided the first time the document is cited herein.

§20.03 and Ex. 1, FSSB HMA, §19.03.)  The HMAs' dispute resolution clauses do not expressly provide that all three arbitrators must be neutral, impartial, or independent.  (Fiotto Decl. at ¶ 13.)  The HMAs' provisions on dispute resolution contain two additional sections that are relevant to the Petition, even though, as discussed below, the provisions have been superseded by the EAAs.

First, Section 20.03(a) of the FSNY HMA provides that "in the case of any arbitration in respect of sections 19.05 and 19.06(a), such third arbitrator shall be an independent arbitrator with at least ten years of experience in the luxury hotel business in the target market in which the Hotel competes and a partner of either Pannell Kerr Forster or one of the four largest firms of Certified Public Accountants in the United States" (the "**Industry Panelist Clause**"). (Fiotto Decl. at ¶ 15, Ex. 2, FSNY HMA §§ 19.05, 19.06, 20.03.)  Section 19.03(a) of the FSSB HMA contains a similar provision with respect to disputes regarding Section 18.07 of that agreement.  (Fiotto Decl. at ¶ 16, Ex. 1, FSSB HMA §§ 18.07, 19.03.)  These provisions reflect the parties' agreement in the HMAs that an industry panelist is *only* required for a dispute regarding Section 19.05 (*i.e.*, whether the FSNY achieved a defined performance test) or Section 19.06(a) (*i.e.*, whether Four Seasons remains one of the world's leading operators and managers of a chain of luxury and five-star hotels) of the FSNY HMA or Section 18.07 of the FSSB HMA (*i.e.*, regarding the turnover of certain books and records on termination of the FSSB HMA).  None of these HMA Sections is the basis for the purported defaults identified in the Default Notices or in Four Seasons' subsequent Dispute Notices (Fiotto Decl. at ¶ 18) that constitute the basis for the arbitration underlying the Petition.

The second set of relevant provisions in the HMAs provide that, in the event of a dispute, before any party may initiate arbitration, the parties must first engage in a non-binding,

mediation process that involves experts.    Section 20.02(b) of the FSNY HMA and Section 19.02(b) of the FSSB HMA both provide that "each [party] shall retain an expert . . . and the experts . . . shall advise the parties of their views" (the "**Expert Mediation Clause**"). (Fiotto Decl. at ¶ 19.)

### C.    The July 2021 Agreement and the May 2022 Protocol

Given the nature of the disputes set forth in the Default Notices and the Dispute Notices, the parties agreed to fundamentally alter the dispute resolution process set forth in the HMAs by entering into a July 28, 2021, agreement (the "**July 2021 Agreement**") and a Stipulated Arbitration Protocol dated May 17, 2022 (the "**May 2022 Protocol**") (together, the "**Existing Arbitration Agreements**," or "**EAAs**").

First, the parties delineated in the July 2021 Agreement that the disputes identified in the Default Notices and the Dispute Notices would be subject to the EAAs.  As the July 2021 Agreement states, that agreement applies "[w]ith respect to *certain disputes for which the dispute resolution process has been triggered* under Section 19.04 and Section 20.02 of the [FSNY HMA and Section 18.04 and Section 19.02 of the FSSB HMA]."  (Emphasis added.)[3] Second, with regard to those delineated disputes, "the Parties agree to conduct a single consolidated arbitration ('Arbitration') in New York, New York before a panel of three neutral, impartial and independent arbitrators."  (Fiotto Decl. at ¶ 21, Ex. 3, July 2021 Agreement at 2.)  Third, because the disputes identified in the Default Notices and Dispute Notices do not include disputes that would have been subject to the Industry Panelist Clause, the parties dispensed with that clause altogether.  Fourth, also because the disputes do not involve matters

---

[3] These sections refer to the clause in the HMAs under which a Dispute Notice triggers the dispute resolution process and the Expert Mediation Clause, as described above.

that require particular industry knowledge, the parties replaced the Expert Mediation Clause with a clause mandating mediation before David Geronemus, a non-expert with respect to the hospitality industry.  (Fiotto Decl. at ¶ 21, Ex. 3, July 2021 Agreement at 2.)  That mediation occurred in 2021.

The May 2022 Protocol confirmed the parties' rejection of the Party Selection Clause and the Industry Panelist Clause.[4]  Section 10 states, "[w]ith respect to selecting the three neutral, impartial and independent arbitrators referenced in the July [2021] Agreement, the Parties shall follow the following process."  (Fiotto Decl. at ¶ 23.)  The May 2022 Protocol provides that each party submits a list of candidates to the AAA every seven business days until the panel is selected.  If there are matches on the parties' lists, the matches serve as arbitrators.  If there are no matches on the parties' lists, either party may agree to select a candidate on the other party's list.  Only if there is a match or one party agrees to someone on the other party's list will "[t]he Parties' counsel . . . *jointly* telephonically contact each potential arbitrator."  (Emphasis added.)  This joint, initial contact ensures complete neutrality, in contrast to a party-appointed arbitrator in which a party is free to unilaterally contact a potential arbitrator in advance of the appointment.

The May 2022 Protocol also does not contain any reference to or variation of the Industry Panelist Clause or otherwise require an industry arbitrator on the panel.  This reflects an additional acknowledgment that the disputes subject to arbitration under the EAAs do not include a dispute for which, under the original HMAs, an industry arbitrator was suitable.  Moreover, in the event any hospitality knowledge was useful in the arbitration, the parties

---

[4] At the time of the May 2022 Protocol, the mediation before Mr. Geronemus had been completed. (Fiotto Decl. at ¶ 22.)

included a provision in the May 2022 Protocol that, if a party wishes to introduce expert testimony regarding the hospitality industry, comprehensive Expert Reports under Fed. R. Civ. P. 26(a)(2)(B) would be required, as well as expert depositions—an uncommon provision in a streamlined arbitration and further confirmation that the parties rejected any requirement (and eschewed any need) for an industry panelist.

### D.    The Arbitrator Selection Process

On June 7, 2022, the parties began the process of submitting lists to the AAA every seven business days except when the parties jointly and voluntarily agreed to extend the seven-day period (which occurred on seven occasions) to conduct interviews of candidates. These agreed-upon extensions involved accommodating the schedules of the candidates, which during the summer months proved challenging.  (Fiotto Decl. at ¶ 28.)

In July 2022, after the parties had submitted their second list of eight candidates to the AAA, Four Seasons sought to accelerate the process and agreed to interview a specified retired judge from the Petitioners' list who had formerly served on the New York State Supreme Court.  On August 4, 2022, Four Seasons agreed to accept this judge as an arbitrator if the Petitioners were prepared to select an arbitrator from the candidates Four Seasons identified on its first two lists.  Four Seasons proposed that, after the two arbitrators had been picked, the parties could discuss the third in light of the credentials and background of the two empaneled arbitrators.  (Fiotto Decl. at ¶ 31.)

Petitioners' counsel rejected this simple, expedited solution and added a new condition to the selection process, insisting that the parties include an industry arbitrator on the panel. Petitioners' counsel made this demand despite the facts that (a) the EAAs do not provide for an industry panelist, (b) the parties intentionally drafted two agreements that did not

incorporate the Industry Panelist Clause, and (c) even if they had incorporated the Industry Panelist Clause in the EAAs, the clause would not, by its terms, apply to the disputes identified in the Default Notices, Dispute Notices, and the July 2021 Agreement.  (Fiotto Decl. at ¶ 32.)

Moreover, the issues to be addressed in the Default Notices and Dispute Notices are not industry-specific issues that require industry knowledge.  Rather, they are complicated legal questions relating to contractual rights, the application of legal principles, and the determination of substantial economic damages.  The arbitration will also involve evaluating the credibility of numerous witnesses.  These are precisely the matters that arbitrators who have previously served as judges have developed significant expertise in addressing.

In any event, the proposed industry panelists Petitioners identified on their lists were not "neutral, impartial and independent" because industry consultants primarily consult for owners of hotels or resorts—that is, they are advocates for owners—or they are engaged in working for direct competitors of Four Seasons.  Four Seasons should not have such a panelist, who would become privy to Four Seasons' confidential, proprietary operational information, imposed on it.[5]  Moreover, given Four Seasons' prominence in the hospitality industry, it would be difficult to find an industry consultant who lacks ties to, conflicts of interest with, or bias (one way or the other) toward it.  For example, in the two instances in which Petitioners asked Four Seasons to further investigate and consider an industry panelist, it was learned that one worked for three direct competitors of Four Seasons and the other, in addition to working

---

[5] Both the July 2021 Agreement and the May 2022 Protocol provide for confidential proceedings (and the HMAs provide for the protection of Four Seasons' proprietary information) precisely because the hospitality industry is intensely competitive.  (Fiotto Decl. at ¶ 34.)

for competitors, had decades-long relationships with both a high-level former Four Seasons executive and a long-time Four Seasons consultant.  (Fiotto Decl. at ¶ 36.)

Seeking to change the selection requirements again and to subvert the parties' prior agreements, in August 2022, Petitioners' counsel also began insisting that the parties revert to the selection process set forth in the Party Selection Clause that was expressly superseded by the EAAs.  (Fiotto Decl. at ¶ 37.)  Petitioners' counsel also proposed that the parties use the "rank and strike method . . . under the AAA's Commercial Arbitration Rules."  (Pet. at 8.)  Both of these proposed "alternatives" were squarely rejected when the parties drafted the EAAs.  Notably, with respect to the latter, it was clear that the parties intentionally rejected a rank-and-strike selection because the parties agreed in the May 2022 Protocol to use the AAA's Commercial Arbitration Rules but omitted the rank-and-strike process provided for in those rules.  (Fiotto Decl. at ¶ 37, Ex. 6, May 2022 Protocol at ¶¶ 1, 10.)

In any event, the parties submitted four sets of lists to the AAA and conducted five candidate interviews.  Additionally, the parties attempted to schedule two additional interviews with retired federal judges.  One, who appeared on Four Seasons' list, declined due to scheduling conflicts, while the other, who appeared on the Petitioners' list, identified a potential conflict.  On October 26, 2022, Four Seasons agreed to interview the judge on Petitioners' list nonetheless and consider waiving any conflict if an appropriate "firewall" were erected.  Petitioners' counsel refused this request.  (Fiotto Decl. at ¶ 38.)

On October 30, 2022, Four Seasons submitted a list of additional candidates to the AAA (as contemplated by the May 2022 Protocol).  Petitioners did not do so and instead filed the Petition on October 31, 2022.  (Fiotto Decl. at ¶ 39.)

### E.     The Parties' Positions with Respect to the Petition

In their Petition, Petitioners argued that the Court's intervention was required to select arbitrators under Sections 5 and 206 of the Federal Arbitration Act.  Section 5 provides that:

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under said agreement with the same force and effect as if he or she had been specifically named therein.

9 U.S.C § 5.  According to Petitioners, there was a "lapse in the naming of an arbitrator" because the parties had exchanged lists on four occasions over five months and had failed to select an arbitrator.  (Petitioners' Mem. at 1 (Dkt. No. 3).)  Petitioners proposed that the Court should "order that arbitrators be appointed in accordance with the selection process set forth in the" HMAs.  (*Id*. at 2.)  Alternatively, Petitioners proposed that the Court (a) order the parties to use the rank-and-strike selection process under the AAA's Commercial Arbitration Rules, or (b) "directly appoint all three arbitrators" from the parties' previously exchanged lists "and should select at least one arbitrator with experience in the hospitality industry."  (*Id*. at 2.)

In its Opposition to the Petition, Four Seasons argued that Petitioners had fabricated a breakdown in the arbitrator selection process by insisting on an industry panelist even though the parties had rejected the Industry Panelist Clause and even though that clause would not have applied in any event, given the nature of the parties' dispute.  (FS Mem. at 2-3 (Dkt. No. 19).)   Four Seasons also argued that there had not been a breakdown in the process

because, other than Petitioners' unjustified insistence on an industry panelist, the selection

process had proceeded exactly as the parties contemplated:

> While the EAAs required that the parties submit lists every
> seven business days, the parties could voluntarily extend that
> period to accommodate scheduling interviews of potential
> panelists. This is exactly what happened. This is therefore not
> a case involving one party ignoring the time limits imposed on
> the selection process. Nor is it a case where the selection
> process' express time limits were ignored or abandoned by both
> parties. Rather, except for Petitioner's refusal to timely submit
> a list on October 30—the day before Petitioners filed their
> Petition—the parties voluntarily extended the process to
> accommodate the very interviews provided for in the EAAs.

(FS Mem. at 14.)[6]  Finally, Four Seasons argued that, were the Court to find that the parties

had reached an impasse, Section 5 of the FAA, as confirmed by Second Circuit and other

appellate authority, including the United States Supreme Court, required the Court to "give

effect to the intent of the parties" as expressed in the EAAs. (*Id.* at 15.) That is, because the

parties had expressly eschewed the selection process in the HMAs (and, for that matter, in the

AAA's Commercial Rules), ordering the parties to proceed under either of those methods

would violate Section 5 of the FAA.

### F.    The Court's Order

In the Order, the Court found that the July 2021 Agreement and the May 2022 Protocol

were the governing arbitration agreements, and indeed defined them as the "Existing

Arbitration Agreements" or "EAAs." (Op. at 3 (Dkt. No. 30).) As the Court also recognized,

the parties had eschewed the HMAs' arbitration provisions when they entered into the July

---

[6] Four Seasons also pointed out that, on August 4, 2022—less than 60 days after the parties commenced the
selection process and after the parties had exchanged two lists—Four Seasons had agreed to accept a retired
judge on Petitioners' lists if Petitioners selected an arbitrator from candidates Four Seasons identified on its first
two lists. Four Seasons proposed that, after the two arbitrators had been picked, the parties could discuss the
third in light of the credentials and background of the two empaneled arbitrators. (FS Mem. at 10.)

2021 Agreement—which required a "single, consolidated arbitration . . . before a panel of three neutral, impartial and independent arbitrators"—and "*further eschewed* applying the arbitration provisions in the HMAs to these disputes when they entered into the May 2022 Protocol." (Op. at 3 (emphasis added).)

The Court found that the parties had exchanged "their first list of potential arbitrators" on June 7, 2022, "none of which had any joint candidates." (Op. at 3–4.) The Court then summarized the history of the parties' selection process, which included the parties' mutual agreements from time to time to extensions of time to interview candidates on the parties' lists. (*Id.* at 3.) According to the Court, "[r]ather than following the Protocol and next reviewing the other's list for any matched candidates, the parties convened joint interviews of two candidates, one for each party." (*Id*. at 4.)[7] "But, following the interviews, the parties did not agree to appoint either candidate." (*Id*.) The Court found that the parties "submitted their second list of potential candidates on July 28, 2022. Again, there were no joint candidates, and the parties deferred selecting any matched candidates, instead interviewing a potential candidate from Owner's list, who they ultimately declined to appoint." (*Id.*)

According to the Court, "This process proceeded unsuccessfully for a third and fourth round, resulting [in] four additional candidates being interviewed but none being appointed." (*Id.*) The Court ruled that: "In these circumstances, and with no indication that the parties will come to a consensus, it is appropriate for the Court to break the impasse between them." (*Id.* at 6.) As to the cause of the "impasse," the Court acknowledged Four Seasons' argument that

---

[7] The Court's use of the word "rather" suggests that the Court believed that the parties had abandoned or otherwise departed from the EAAs. In fact, as noted above, the EAAs expressly provided that, if there were no matches, the parties could nonetheless agree to interview any candidate on any of the lists and thus there were agreed-upon extensions of list exchanges to accommodate those interviews.

"[Petitioners'] insistence on an industry arbitrator as a pre-condition to proceeding is Owners'

attempt to unilaterally manufacture a deadlock to avoid complying with the" EAAs.  (Op. at

5.)  The Court found, however, that Petitioners' "penchant for an insider cannot be said to have

driven the appointment process to a halt" because Petitioners had "proposed a number of

non-industry arbitrators, including former judges."  (*Id.*)

The Court then turned to the question of "how the Court should appoint the arbitrators."

(*Id.* at 7.)  According to the Court, "[t]he court must appoint 'an arbitrator in a way that [gives]

effect to the parties' agreement."  (*Id.* (*quoting Stop & Shop Supermarkets Co. LLC v. United

Food & Com. Workers Union Loc. 342, AFL-CIO, CLC*, 246 F. App'x 7, 11 (2d Cir. 2007)).)

"Arbitration agreements," reasoned the Court, "like any other contract, must be enforced

according to their terms."  (*Id.* (*citing AT&T Mobility LLC. v. Concepcion*, 563 U.S. 333, 339

(2011)).)  The Court cited *Moss v. First Premier Bank*, 835 F.3d 260, 264 (2d Cir. 2016) for

the proposition that, "to discern the parties' intention, courts must look to the language of the

arbitration agreement."  (*Id.* at 7.)

Although the Court clearly articulated the governing law under which the Court was

required to resolve the supposed impasse, the Court just as clearly departed from it.  Rather

than "appoint[ing] 'an arbitrator in a way that [gives] effect to the parties' agreement"—here,

the EAAs—or "look[ing] to the language of the" EAAs "to discern the parties' intentions," the

Court held that "it is time to abandon the concepts expressed in the EAAs."  (*Id.* at 7.)  Further,

although the Court found that the parties had clearly and unequivocally "eschewed applying

the arbitration provisions in the HMA to these disputes when they entered into" the EAAs, *id.*

at 3, "[t]he Court direct[ed] the parties to return to the system articulated in the original HMAs,

which are . . . the parties' first-expressed choice."  (*Id.* at 8.)

14

## III.    ARGUMENT

A court should reconsider its conclusion where doing so is necessary to correct a clear error or prevent manifest injustice.  *See Schoolcraft v. City of New York*, 298 F.R.D. 134, 136 (S.D.N.Y. 2014) (holding that reconsideration is granted when the moving party demonstrates an "intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."); *see also Corines v. Am. Physicians Ins. Tr.*, 769 F. Supp. 2d 584, 594 (S.D.N.Y. 2011) ("[T]he decision to grant or deny a motion for reconsideration is within the sound discretion of the district court.").

The Court clearly erred by failing to apply binding Second Circuit authority requiring it to effectuate the parties' intent as expressed in the EAAs, by finding that an "impasse" had occurred due to agreed-upon extensions of time, and by failing to find that the cause of any impasse was due to Petitioners' improper insistence on an industry arbitrator.  The Court's ruling is also manifestly unjust because it denies Four Seasons its contractual, arbitral remedy and forces Four Seasons to expend well over a year and millions of dollars engaged in the hollow formality of arbitrating a dispute before an improperly constituted panel that is not authorized to issue a proper award.  *See Avis Rent A Car Sys, Inc. v. Garage Emps. Union Loc. 272*, 791 F.2d 22, 25 (2d Cir. 1986) (holding that, "because arbitration depends on the consent of the parties to the contract," awards are invalid and subject to vacatur if the "method of [arbitrator] appointment fail[s] to conform to [the] arbitration clause[]") (collecting cases); *BP Expl. Libya Ltd. v. ExxonMobil Libya Ltd.*, 689 F.3d 481, 494-495 (5th Cir. 2012) ("Ensuring the proper designation of the arbitral panel is of the utmost importance; an improperly appointed arbitral panel puts the arbitration award at risk for vacatur.").

**A.    The Court Erred When it "Abandoned" the EAAs and Enforced the "Eschewed" HMAs**

The parties agreed that the arbitrator selection process contained in the HMAs was superseded by the EAAs selection process.  The Petitioners repeatedly acknowledged this fundamental change, stating that, while the HMAs provided for party-appointed arbitrators to select a third arbitrator, "the [July 2021] Agreement provided for" the mutual selection of "three neutral, impartial and independent arbitrators."  (Declaration of Gregory J. Scandaglia in Support of Reply in Support of Owner's Petition for an Order Directing Appointment of Arbitrators ("Scandaglia Reply Dec.") at ¶ 8 (Dkt. No. 29).)  Similarly, Petitioner's counsel confirmed that that "[t]he [May 2022] Protocol. . . included a *new, consensus-based process for selecting arbitrators*."  (Declaration of Gregory J. Scandaglia in Support of Petition for Appointment of Arbitrators ("Scandaglia Dec.") at ¶10 (emphasis added) (Dkt. No. 7).)

Because there was no dispute about which arbitration agreements governed the parties' arbitrator selection process, the Court acknowledged that the July 2021 Agreement and the May 2022 Protocol were the "Existing Arbitration Agreements."  (Op. at 3.)  The Court also concluded that the parties had not only repudiated the HMAs' selection process in the July 2021 Agreement, but "*further eschewed* applying the arbitration provisions in the HMAs to these disputes when they entered into the May 2022 Protocol."  (Op. at 3 (emphasis added).)

Despite these unambiguous findings, the Court ordered that it was "time to abandon the concepts expressed in the EAAs" (Op. at 7) and "return to the system articulated in the original HMAs."  (Op. at 8.)  This was despite the fact that the Court clearly acknowledged its obligation under Second Circuit and Supreme Court authority to appoint "an arbitrator in a way that [gives] effect to the parties' agreement" and enforces the parties' intentions as

16

expressed in "the language of the arbitration agreement."  (Op. at 7 (citing *Stop & Shop Supermarket Co., LLC*, 246 F. App'x at 11; *Moss*, 835 F.3d at 264 and *AT&T Mobility LLC*, 563 U.S. at 344 (holding that "principal purpose" of the Federal Arbitration Act is ensure that "private arbitration agreements are enforced according to their terms.")).)  As the Second Circuit squarely held in *Moss*, "[t]o discern the parties' intentions, we look to the language of the [arbitration] agreement."  835 F.3d at 264.

*BP Expl. Libya Ltd. v. ExxonMobil Libya Ltd.*, 689 F.3d 481 (5th Cir. 2012), which the parties briefed in connection with the original Petition, illustrates the error in the Court's decision.  In that case, as with the Second Circuit's *Stop & Shop* decision, the Court emphasized that, under Section 5, a court must "not lose sight of the purpose of the exercise: to give effect to the intent of the parties" as reflected in the governing arbitration agreement.  *Id.* at 494.  In *BP*, plaintiff BP agreed to drill wells for Exxon, and the parties' contract provided a method for selecting three arbitrators in the event of a dispute.  *Id*. at 484.  BP assigned part of its responsibilities to a third party, which also became bound by the contract's arbitration agreement.  *Id*. at 485.  When a dispute arose, Petitioner claimed that the procedure for selecting three arbitrators—designed for two parties—became unworkable with the addition of a third party, and the district court invoked its Section 5 authority.  *Id*. at 486.  The district court ruled that the arbitration panel would consist of five arbitrators: three selected by the parties, and then the three arbitrators would choose two independent arbitrators.  *Id.* at 488.

In reversing the decision, the Fifth Circuit observed that "[e]nsuring the proper designation of the arbitral panel is of the utmost importance; an improperly appointed arbitral panel puts the arbitration award at risk for vacatur."  *Id.* at 494–495.  The appellate court rejected the petitioners' argument that the district court had "carte blanche to select any method

of appointment or any number of arbitrators it considered appropriate." *Id* at 495. Noting that

the parties' "written arbitration agreement is the best evidence of what the parties intended,"

*id.*, the appellate court concluded that "for the district court '[t]o substitute [its] own notion of

fairness in place of the explicit terms of [the parties'] agreement would deprive them of the

benefit of their bargain just as surely as if [the district court] refused to enforce their decision

to arbitrate.'" *Id.* at 496 (citation omitted). "Although strict adherence to three arbitrators

presents a challenge in a three-party dispute in terms of selecting the arbitrators, '[b]y honoring

the letter of the contract, we remain true to the [Federal] Arbitration Act as well as the parties'

intent." *Id.* at 496 (citing *Univ. Reins. Corp.* v. *Allstate Ins. Co.*, 16 F.3d 125, 129 (7th Cir.

1993)).[8] *See also Shell Oil Co. v. CO2 Comm., Inc.*, 589 F.3d 1105, 1109–10 (10th Cir. 2009)

(finding that the district court exceeded its authority by designating the arbitrators in a manner

that was in contravention of the parties' agreed-upon panel selection provision). Here, the

parties clearly expressed their intent to "eschew" the selection process in the HMAs and to

adopt the selection process in the Existing Arbitration Agreements, which the district court

ordered them to "abandon." This is clear error in light of the Court's obligation under

Section 5.

In directing "the parties to return to the system articulated in the original HMAs, which

[is] . . . the parties' first-expressed choice" (Op. at 8), the Court appeared to rely on *T.M. Real

Estate Holding LLC v. Stop & Shop Supermarket Co. LLC*, 2013 WL 603325 (S.D.N.Y.

Feb. 14, 2013), *aff'd sub nom. T.M. Real Est. Holdings, LLC v. Stop & Shop Supermarket Co.*

---

[8] The Court ordered that the district court should consider ordering the Petitioner to select an arbitrator and the two co-Respondents also to select an arbitrator. Alternatively, if the co-Respondents could not agree on an arbitrator, then the district court should select their arbitrator. *Id.* at 497.

*LLC*, 543 F. App'x 41 (2d Cir. 2013) for the proposition that, when an agreement amends a prior contract, the "modifying agreement should be construed in connection with the original contract in order to ascertain the entire intent of the parties." (Op. at 7.) The Court appears to have erroneously concluded that, under *T.M. Real Estate*, the parties' "intent" in crafting the arbitration selection provisions of the HMAs (that is, to use a party-appointed process), is somehow relevant to interpreting the intent of the parties as expressed in the EAAs (which is not to use the party-appointed process).

Putting aside that this directly contradicts the Court's finding that the parties "eschewed"—indeed, "further eschewed"—the HMAs' selection process when they entered into the EAAs, *T.M. Real Estate* does not support the Court's reasoning. In that case, the court determined that language in a lease amendment could be read in a manner consistent with the terms of the original contract, and thus rejected the plaintiff's interpretation, which would have rendered contractual language superfluous and required the court to consider parol evidence. *T.M. Real Estate*, 2013 WL 603325 at *10. As an initial matter, the *T.M. Real Estate* court enforced the *amendment* and not—as the Court did here—the original provision. In any event, the facts of that case stand in stark contrast to the instant case where the parties, by agreeing to a new arbitrator selection protocol in the EAAs, plainly signaled their intent to abandon the HMAs' mechanism, as the Court expressly found. Contrary to the *T.M. Real Estate* case, it would be impossible to read the HMAs' selection process—in which each party independently selects an arbitrator and the two arbitrators select a third—as consistent with or complementary to the EAAs' process, which Petitioner described as creating "a new, consensus-based process for selecting arbitrators" (Scandaglia Dec. at ¶10) who would be, in the words of the Court and

the Letter Agreement, "neutral, impartial and independent." (Op. at 3.)[9] As such, unlike the situation in *T.M. Real Estate*, here the new arbitrator selection language in the EAAs entirely supplanted the prior arbitrator selection provisions in the HMAs, and the Court's inconsistent ruling otherwise is erroneous.

## B. The Court Erred When It Found an Impasse as a Result of Agreed-Upon Extensions of Time

It is undisputed that the EAA selection process required that matched candidates on both parties' lists would become arbitrators. It is also undisputed that, if there were no matches, either party could nonetheless agree that a candidate on the other party's list would be acceptable pending a joint interview by the parties' counsel. As Petitioner's admit, "each party had an opportunity to identify any unmatched candidate from the other's list," and "the parties would then jointly telephonically contact" those candidates. (Scandaglia Dec. at ¶ 11.) Petitioners also do not dispute that the parties exchanged lists every seven business days *except when the parties jointly and voluntarily agreed to extend the seven-day period* (which occurred on seven occasions) to conduct interviews of candidates. These agreed-upon extensions involved accommodating the schedules of the candidates, which during the summer months proved challenging. (Fiotto Decl. at ¶ 28.) Absent these extensions, the EAA selection process had proceeded for the equivalent of a single month, with the parties exchanging four lists at a rate of one list each week.

---

[9] Courts in this district have recognized that "[w]hen parties agree to modify their contract 'the modification establishes a new agreement between the parties which supplants the affected provisions of the underlying agreement while leaving the balance of its provisions unchanged.'" *Delta Air lines v. Bombardier, Inc.*, 2021 WL 1163702, at *11 (S.D.N.Y. Mar. 25, 2021), *aff'd,* No. 21-1028, 2021 WL 5492938 (2d Cir. Nov. 23, 2021) (citing *Benipal v. Herath*, 674 N.Y.S.2d 815, 816 (3d Dep't 1998)); *see also United States v. J. Kokolakis Contracting, Inc.*, 2007 WL 1771561, at *4 (S.D.N.Y. June 19, 2007) (noting that contract modification "results in the establishment of a new agreement between the parties which *pro tanto* supplants the affected provisions of the original agreement while leaving the balance of it intact") (citations omitted).

Despite the fact that the parties were following the EAAs exactly as written, the Court ruled that an "impasse" had occurred because the process had proceeded for five months without the selection of a panel.  (Op. at 6.)  In support of its ruling, the Court relied on *Stop & Shop Supermarket Co.*, 246 F. App'x at 11.  In that case, the collective bargaining agreement between Stop & Shop and the union provided that, as disputes arose, an arbitrator would be appointed from each parties' list of arbitrators on an alternating basis—that is, first from Stop & Shop's list, second from the union's list, and so on.  The parties disagreed over which party's list was next, and both refused to proceed with the selection process.    Under these circumstances of an obvious stalemate, the Second Circuit ruled that "[s]uch a deadlock satisfies FAA §5's requirement of a 'lapse in the naming of an arbitrator.'"  246 F. App'x at 10.  Notably, the *Stop & Shop* Court affirmed the district court because it had "properly exercised its authority under [Section 5 of the FAA] by appointing an arbitrator in a way that *gave effect to the parties' agreement*."  *Id.* at 10 (emphasis added).

In contrast, the passage of time here was not due to any stalemate or breakdown in the process.  Rather, it was due solely to agreed-upon extensions between the parties to temporarily delay exchanging lists while the parties jointly interviewed panelists (who were not matches but were potentially acceptable).  That is to say, this was not a breakdown in the process; this *was* the process.  While Petitioners did not provide their list when Respondents did on October 30, 2022, and instead filed their Petition the next day on October 31, 2022 (Fiotto Decl. at ¶ 39.), "a party may not unilaterally manufacture a 'deadlock' scenario in order to avoid complying with the contract to which it agreed."  *Karrena USA Inc. v. Cobra Thermosolar Plats, Inc.*, 2022 WL 73518, at *3 (D. Nev. Jan. 7, 2022), report and recommendation adopted sub nom. *Karrena USA Inc. v. Cobra Thermosolar Plants, Inc.*, 2022 WL 1185012 (D. Nev.

Apr. 20, 2022); *see also Adam Techs. Int'l S.A. de C.V. v. Sutherland Glob Servs., Inc.*, 729 F.3d 443, 451 (5th Cir. 2013) (finding no breakdown under Section 5 when any delay was due to one party's "noncompliance" with the contractual selection process); *Certain Underwriters at Lloyd's London v. Vintage Grand Condominium Ass'n, Inc.*, 2019 WL 760802 at *2 (S.D.N.Y February 6, 2019) (relied upon by the Court (Op. at 4) and denying petitioners' application under Section 5 because petitioner had not followed the agreed-upon selection method and observing that "courts have little business interfering in arbitrations").

**C.    The Court Erred When It Failed to Find that Any Impasse Was Due to Petitioners' Insistence on an Industry Arbitrator**

If in fact there was an impasse, the Court erred when it found that any impasse was *not* due to Petitioners' insistence on an industry arbitrator.  According to the Court, "Owners' insistence on an industry arbitrator as a pre-condition to proceeding . . . cannot be said to have driven the appointment process to a halt."  (Op. at 5.)  This was because, reasoned the Court, "Owners proposed a number of non-industry arbitrators, including former judges, in addition to industry professionals."  (*Id.*)  But this ruling was erroneous because it is undisputed that, on August 4, 2022, less than two months after the selection process began, Four Seasons agreed to accept a former judge on Petitioners' list if the Petitioners were prepared to select an arbitrator from the candidates Four Seasons identified on its first two lists.  (Fiotto Decl. at ¶ 31.)  Four Seasons proposed that, after the two arbitrators had been picked, the parties could discuss the third in light of the credentials and background of the two empaneled arbitrators. (*Id.*)

It is also undisputed that Petitioners' counsel rejected this and insisted that the parties include an industry arbitrator on the panel despite the facts that (a) the EAAs do not provide

for an industry panelist; (b) the parties intentionally drafted two agreements that did not incorporate the Industry Panelist Clause; and (c) even if they had incorporated the Industry Panelist Clause in the EAAs, the clause would not, by its terms, apply to the disputes identified in the Default Notices, Dispute Notices, and the July 2021 Agreement. (Fiotto Decl. at ¶ 32.) As well, recognizing that the disputes identified in the notices and the EAAs did not involve the need for industry expertise, the parties replaced the Expert Mediation Clause with a clause mandating pre-arbitration mediation before David Geronemus, a non-expert with respect to the hospitality industry. (Fiotto Decl. at ¶ 21, Ex. 3, July 2021 Agreement at 2.)

Further, as Four Seasons demonstrated, the proposed industry panelists Petitioners identified on their lists are not "neutral, impartial and independent" because industry consultants primarily consult for owners of hotels or resorts—that is, they are advocates for owners—or they are engaged in working for direct competitors of Four Seasons. For example, in the two instances in which Petitioners asked Four Seasons to further investigate and consider an industry panelist, it was learned that one worked for three direct competitors of Four Seasons and the other, in addition to working for competitors, had decades-long relationships with both a high-level former Four Seasons executive and a long-time Four Seasons consultant. (Fiotto Decl. at ¶ 36.)[10]

While the Court correctly ruled that it "need not worry about [the impasse's] particular cause as Section 5 applies irrespectively," Op. at 5 (*quoting* 9 U.S.C. 5 "('If for any other

---

[10] It is for similar reasons that courts, in cases cited by Petitioners, select retired judges when they are required to appoint an arbitrator under Section 5. *See, e.g., Evangelical Lutheran Good Samaritan Soc'y v. Moreno by Hatton*, 2019 WL 999736 at *8 (D. N.M. Feb. 28, 2019) (appointing a retired judge because he would have the necessary experience "finding facts, reaching conclusions of law, and deciding cases on their merits"); *Baylor Health Care Sys. v. Beech St. Corp.*, 2013 WL 2095777 (N.D. Tex. May 15, 2013) (appointing a retired judge because, given Baylor Health Care's prominence, "it will be difficult to find an arbitrator with experience in the health care industry who lacks ties, conflicts of interest or bias relating to" Baylor Health Care).

reason there shall be a lapse' the court can appoint an arbitrator)"), the Court's error prevented it from imposing the remedy most consistent with Section 5 and the parties' intentions. Because Section 5 requires, as an initial matter, that the parties' existing arbitration agreements "shall be enforced," the Court should have ordered the parties to select a panel of retired judges after clarifying that Petitioners' insistence on an industry panelist was not contemplated by the EAAs.  Or the Court could have selected three arbitrators from the retired judges identified on the parties' first two lists exchanged on June 7, 2022, and June 28, 2022, which reflect the parties' earlier selections.  These were proposed by Four Seasons as Section 5 remedies consistent with Court's own ruling that "[t]he court must appoint 'an arbitrator in a way that [gives] effect to the parties' agreement."  (*Id*. (*quoting Stop & Shop,* 246 F. App'x at 11 (2d Cir. 2007)); *see* Respondents' Mem. at 21-23.)

## IV.    CONCLUSION

For the reasons described above, the Court should grant reconsideration and, upon reconsideration, (a) order that the parties must proceed to select a panel of retired judges after clarifying that Petitioners' insistence on an industry panelist was not contemplated by the EAAs, or (b) select three arbitrators from the retired judges identified on the parties' first two lists exchanged on June 7, 2022, and June 28, 2022, which reflect the parties' earlier selections. Alternatively, if the Court believes that Petitioners are entitled to have an industry arbitrator, the Court should require the parties to proceed as described on page 22 of the FS Mem. to ensure that all arbitrators meet the requirements of neutrality, impartiality, and independence and also hold a law degree.

Dated:   June 28, 2023                Respectfully submitted,
             Boston, Massachusetts

                                            MORRISON & FOERSTER LLP

                                            By:  */s/ Anthony S. Fiotto*
                                                Anthony S. Fiotto
                                                Nathan D. Reilly
                                                200 Clarendon Street
                                                Boston, MA 02116
                                                (617) 648-4774
                                                afiotto@mofo.com
                                                nreilly@mofo.com

                                                *Counsel for Respondents*
                                                *FSR International Hotels Inc. and*
                                                *Four Seasons Hotels Limited*